**In re OKLAHOMA CITY BROADCASTING COMPANY, dba KGMC–TV, Debtor.**

**Bankruptcy No. 89–906–TS.**

United States Bankruptcy Court, W.D. Oklahoma.

March 8, 1990.

Gretchen Harris, Kwame Mumina, Ruth Brummett, Andrews, Davis, Legg, Bixler, Milsten & Price, Oklahoma City, Okl., for debtor.

Gregory Gordon, Robert Stone, Jones, Day, Reavis & Pogue, Dallas, Tex., Warren Majors, Spradling, Alpern, Friot & Gum, Oklahoma City, Okl., for NCNB Texas Nat. Bank.

Jared Giddens, Kiran Phansalkar, Bryan Wells, Hastie & Kirschner, Oklahoma City, Okl., for unsecured Creditors Committee.

### ORDER VALUING NCNB'S SECURED CLAIM

JOHN TeSELLE, Bankruptcy Judge.

On June 9, 1989, Debtor filed its Plan of Reorganization and Disclosure Statement (hereinafter the "Plan" and the "Disclosure Statement"). A hearing on approval of the Disclosure Statement was originally set for July 13, 1989, continued to August 16, 1989, then again continued until after the filing of an amended disclosure statement.

The First Amended Plan of Reorganization (hereinafter the "Amended Plan") was filed jointly by Debtor and the Official Unsecured Creditors' Committee (hereinafter the "Committee") on October 30, 1989. Debtor filed a disclosure statement that same day. The hearing on approval of

the disclosure statement was held on November 22, 1989. At that time the disclosure statement, amended as announced at the hearing, was approved.[1]

Confirmation was set for December 20, 1989. Debtor filed a memorandum, and the Committee filed a brief in support of confirmation. NCNB Texas National Bank, N.A. (hereinafter "NCNB"), filed an objection and supporting memorandum (hereinafter the "NCNB Memorandum") to the Amended Plan, to which Debtor filed a reply memorandum.

During a pre-hearing conference held the day before the hearing, the parties agreed that the value of NCNB's secured claim should be determined before proceeding further towards confirmation. Accordingly, the hearing held December 20 and 21, 1989, was limited to that issue. At the conclusion of the hearing the Court took the matter under advisement. This Order addresses only the valuation of NCNB's secured claim.

### Background

Debtor is one of three independent television broadcasting stations in Oklahoma City. Amended Disclosure Statement at 24; NCNB Memorandum at 6; NCNB Exhibit 8 at 1–3. No other United States television market the size of Oklahoma City has more than two independent stations. NCNB Exhibit 8 at 2–3.

In late 1988, Pappas Telecasting (hereinafter "Pappas") offered to purchase all three independent television stations in Oklahoma City. Amended Disclosure Statement at 19; NCNB Memorandum at 6. Debtor's share of the purchase price was to be $3.6 million. NCNB Memorandum at 6. The proposal involved eliminating two of the stations (including Debtor) from the air and returning their licenses to the FCC, thus improving the profitability of the remaining station. Amended Disclosure Statement at 19; NCNB Memorandum at 6. Although Debtor agreed to accept this offer, it was subsequently withdrawn by Pappas. NCNB Memorandum at 6.

Debtor filed its Chapter 11 bankruptcy petition on February 9, 1989. Amended Disclosure Statement at 19; NCNB Memorandum at 6. Shortly thereafter, Heritage Media Corporation (hereinafter "Heritage") offered $3.3 million for Debtor's assets. NCNB Memorandum at 6. Heritage, like Pappas, intended to remove Debtor from the air and return its license to the FCC. NCNB Memorandum at 6. This offer was declined. NCNB Memorandum at 6.

Currently NCNB has an option contract with KAUT to sell to KAUT that portion of Debtor's assets in which NCNB has a security interest for $3,000,000.00. NCNB Memorandum at 9. KAUT is one of the Oklahoma City independent stations and a subsidiary of Heritage. NCNB Exhibit 8 at 11; NCNB Memorandum at 9. NCNB's exercise of this option is dependent upon its obtaining relief from the automatic stay and foreclosing its security interest in its collateral. NCNB Memorandum at 9. Apparently KAUT is willing to pay a substantial sum more than Debtor's liquidation value to remove Debtor from the airwaves. In fact, except to the owner and unsecured creditors, Debtor may be monetarily worth more dead than alive.

The Court does not believe the best interests of the viewers in the Oklahoma City area will be served if Debtor is taken off the air.[2] However, the Court doubts it is within its province to entertain that question, or even consider it as a factor in deciding this matter.

Debtor owes NCNB somewhere between $2,700,000.00 and $3,300,000.00.[3] NCNB

---

1. The announced amendments were incorporated into an Amended Disclosure Statement (hereinafter the "Amended Disclosure Statement") filed November 27, 1989.

2. Within Debtor's viewing area only 40–60% of the viewers have access to cable television, or are cable subscribers. NCNB Exhibit 8 at 14, 18, & 22–23. During the two months prior to the hearing, Debtor's revenues increased in apparent response to the recent improvements of its viewing fare.

3. Debtor claims the principal balance due NCNB is $2,700,000.00. NCNB claims Debtor owes in excess of $3,300,000.00, which includes accrued interest.

has a perfected security interest in all of Debtor's assets, with the exception of Debtor's Federal Communications Commission (hereinafter "FCC") license and possibly some or all of its film contracts (those assets of Debtor in which NCNB has a security interest are hereinafter referred to as the "Collateral"). In order to value NCNB's secured claim, the Court must first determine the appropriate method of valuation, then employ that method to ascertain the value of NCNB's Collateral.

## Testimony of Witnesses

### Charles H. Kadlec

The hearing was somewhat unusual in that while Debtor had the burden of proof, in order to expedite the hearing counsel for NCNB agreed to call its appraiser as the first witness. Thus, the primary evidence consisted of the oral testimony and written appraisal of NCNB's appraiser and qualified expert witness, Charles H. Kadlec. Because he was the first witness and the only witness with a formal written appraisal, much as in the child's game, Mr. Kadlec established himself as "king of the valuation mountain." As neither Debtor nor the Committee had comparable valuation evidence to present, their response was, of necessity, directed towards an attempt to discredit key portions of Mr. Kadlec's testimony and appraisal.

Mr. Kadlec's well-researched appraisal placed Debtor's going concern value at $3,250,000.00, based primarily on a discounted cash flow valuation technique. NCNB Exhibit 8 at 5. This technique requires making projections of the property's cash flow stream for a certain number of years in the future, adding to that the property's anticipated appreciation in value over that same time period, then discounting that number to present value. NCNB Exhibit 8 at Appendix B. Mr. Kadlec's estimates of Debtor's future cash flows were critical components in arriving at the going concern value of Debtor, and were the subject of attack by Debtor and the Committee.

Mr. Kadlec also testified regarding Debtor's liquidation value. That value, including cash and accounts receivable, but not intangibles, was $1,835,000.00.

### Ron Ninowski

Mr. Ninowski was called by Debtor. He was marginally qualified, and his testimony was difficult to follow. After about two hours of direct examination, his credibility was destroyed in twenty minutes by effective cross-examination. His testimony contributed nothing towards this Court's determination of the value of NCNB's secured claim.

### David Schutz

This witness for the Committee was both articulate and thorough in his responses. His testimony was illuminating and helpful. He was very knowledgeable concerning the television broadcasting industry generally, but he had not conducted a thorough study of the Oklahoma City market. Mr. Schutz testified 1) that goodwill, which includes advertising contracts and audience loyalty, takes about three years to develop; 2) going concern value generally exceeds liquidation value by 15 to 40%; 3) the value of an FCC license is dependent on the station's money-making ability; and 4) based solely upon his review of Table 7 in Mr. Kadlec's appraisal (NCNB Exhibit 8), the value of Debtor's FCC license was $750,000.00 to $1,200,000.00.

### First Issue

The first question for resolution is by what criteria the value of NCNB's secured claim is to be determined.

### Discussion of First Issue

Debtor contends the value of NCNB's secured claim should be determined by the amount Debtor's hard assets would bring upon foreclosure. NCNB asserts Debtor's going concern value should be the determinant. The Committee argues it should be Debtor's going concern value less the independent value of the FCC license. The Court believes it is none of the above.

■ Debtor, relying primarily on one law journal article authored by a bankruptcy

judge,[4] proposes the value of NCNB's secured claim should be limited to the amount obtainable upon foreclosure of Debtor's hard assets. According to Debtor, its hard assets would bring $1,200,000.00 upon foreclosure. NCNB's security interest encompasses more than Debtor's hard assets, thus this approach is not applicable and will not be used.

■ NCNB maintains it is entitled to have its secured claim determined by Debtor's going concern value, because Debtor intends to reorganize and continue operation of its business. NCNB's appraiser testified that Debtor's going concern value is $3,250,000.00. This method is also not applicable as NCNB's security interest in Debtor's assets does not include Debtor's broadcasting license, and a television station without a broadcasting license is not a going concern.

■ The Committee would have the Court independently determine the value of Debtor's FCC license, then subtract that amount from Debtor's going concern value to ascertain the value of NCNB's secured claim. However, as stated above, going concern value is not a relevant value at this stage of the proceedings.[5] Also, the evidence relating to the actual value of Debtor's FCC license was not sufficiently substantiated to permit its use in determining the value of the FCC license. Therefore, this approach is also not acceptable to the Court.

■ None of the methods proposed by the parties values only those assets of Debtor constituting NCNB's Collateral. The Court is of the opinion this can best be achieved by determining the market values of those assets of Debtor which constitute NCNB's collateral. The total of those values will be the value of NCNB's secured claim.

## Second Issue

Thus, the Court must next determine the market values of only those items which constitute NCNB's Collateral.

### Discussion of Second Issue

■ KAUT is willing to pay $3,000,000.00 for NCNB's collateral if relief from the stay is granted by this Court and NCNB then forecloses its security interest therein. NCNB contends KAUT's offer establishes the value of its Collateral. Since the offer has been made to NCNB, it must be examined to determine if it encompasses more of Debtor's assets than those constituting NCNB's Collateral. If so, this offer does not set the value of NCNB's Collateral.

NCNB's appraiser testified that Debtor's assets including its cash and receivables, but less the broadcasting license, would bring only $1,835,000.00 if sold on the open market.[6] If assets equivalent to those of Debtor can be purchased on the open market for $1,835,000.00, or anything close to this figure, and KAUT is willing to pay NCNB $3,000,000.00 for these assets, what is KAUT buying for the additional $1,165,000.00? The only answer appears to be that this is what it is worth to KAUT to take Debtor off the air and thereby reduce competition. Thus, it is much in the nature of a bounty offered by KAUT to NCNB to remove Debtor from the air.[7]

The primary question then becomes whether the Bounty is a part of NCNB's Collateral. The only way NCNB could have an interest in the Bounty is if either the Bounty or the rights from which the

---

4. Queenan, James F. Jr., *Standards for Valuation of Security Interests in Chapter 11*, 92 Com. L.J. 18 (1988).

5. NCNB has moved for relief from the automatic stay to foreclose its Collateral. If that relief is granted, there will be no "going concern" to be valued. On the facts in this case, Debtor's going concern value will only become an issue if confirmation is sought under the "cram down" provisions of § 1129(b). In that event, the value of NCNB's secured interest in Debtor's

going concern value under § 1129(b)(2)(A) may need to be determined.

6. Debtor's broadcasting facility and equipment are ten years old, which greatly limits their marketability.

7. For the purpose of brevity, this difference in value between Debtor's liquidation value and the amount of KAUT's offer will hereinafter be referred to as the "Bounty."

Bounty arise are included within Debtor's general intangibles. The definition of "general intangibles" in Section 9–106 of the Uniform Commercial Code does not appear to encompass the Bounty. A review of the case law fails to reveal a case exactly on point.

The case most closely analogous to these facts is *Devine v. Swartz (In re Swartz),* 62 B.R. 88 (Bankr.D.Neb.1986). In *Swartz,* the court held that the right to terminate a lease was not a general intangible.[8] *Id.* at 90. Therefore, the creditor with a security interest in debtors' general intangibles was not entitled to payments made to debtors in exchange for debtors' termination of the lease. *Id.* Likewise, in this case, where the Bounty is being offered to take Debtor off the air, it is not a general intangible within the purview of NCNB's security interest, and thus not a part of NCNB's Collateral.

It is significant to the Court that KAUT's $3,000,000.00 offer was made to NCNB, and would make NCNB substantially whole. No direct evidence was presented to the Court as to whether NCNB was financing KAUT's offer, and, if so, the terms of the financing, but it does appear KAUT is also a customer of NCNB.

KAUT has not appeared in and is not a party to these proceedings and its offer is not enforceable by this Court. KAUT's offer was made to NCNB and is enforceable only by NCNB. The value attributable to the Bounty represents value to be received by NCNB in excess of the liquidation value of those items constituting NCNB's Collateral, and would constitute a windfall for NCNB.[9] Since the Bounty is not a part of NCNB's Collateral, KAUT's offer to NCNB cannot and does not determine the value of NCNB's collateral and hence may not be considered in determining the value of NCNB's secured claim.

■ The sole evidence of the liquidation values of items constituting NCNB's Collateral was presented by NCNB's appraiser, Mr. Kadlec. He testified that certain of Debtor's assets in which NCNB has a security interest will bring $1,835,000.00 if sold on the open market. Mr. Kadlec provided a graphic breakdown of that amount, which is as follows:

| | |
|---|---|
| Real Estate | $260,000.00 |
| Transmitter/Antenna | $250,000.00 |
| Studio/Office | $325,000.00 |
| Cash and Receivables | $1,000,000.00 |
| Total | $1,835,000.00. |

No value was attributed to income from tower leases,[10] film contracts or sales contracts. The FCC license was also properly not included in the liquidation value.

The figures presented by NCNB's appraiser are well substantiated and come closest to including all items of NCNB's Collateral, without attributing any value to items not included within NCNB's security interest. Accordingly, the value of NCNB's secured claim will be based upon Mr. Kadlec's liquidation values of the items of NCNB's Collateral listed above, as supplemented herein.

Mr. Schutz testified there is little advertiser loyalty. However, the relationships with advertisers and the advertising sales contracts in place should, if transferable, be worth something to another television broadcaster. Based upon testimony adduced during the hearing, the Court is of the opinion that the value of those items of NCNB's Collateral not assigned a liquidation value by Mr. Kadlec, along with the difference between foreclosure value and market value, should increase Debtor's liquidation value by an amount approximating $165,000.00.

### Decision

The value of NCNB's secured claim is the market value of only those items which constitute NCNB's Collateral. The Court

---

8. For the proposition that not all intangibles are "general intangibles" within the meaning of the Uniform Commercial Code *see Capital National Bank v. McDonald's Corp.,* 625 F.Supp. 874 (S.D. N.Y.1986).

9. If the value of the Bounty can be captured, it should be preserved for the benefit of the unsecured creditors in this bankruptcy proceeding.

10. Currently, Debtor is receiving income of approximately $5,000.00 per month by leasing antenna space to other types of broadcasters.

determines that amount to be $2,000,-000.00. Having established the value of NCNB's secured claim, the hearing on confirmation of Debtor's Amended Plan can now continue. Upon request, the reconvening of the confirmation hearing will be scheduled to permit the pending objections to be heard.

IT IS SO ORDERED.