In re SRJ ENTERPRISES, INC., d/b/a Stephen Jones Nissan of Buffalo Grove, Debtor.

NBD PARK RIDGE BANK, Plaintiff,

v.

SRJ ENTERPRISES, INC., d/b/a Stephen Jones Nissan of Buffalo Grove; and Success National Bank of Lincolnshire, f/k/a First National Bank of Lincolnshire, Defendants.

Bankruptcy No. 92 B 06101.
Adv. No. 92 A 00771.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Feb. 17, 1993.

Edward J. Lesniak, Burke, Warren & MacKay, P.C., Chicago, IL, for NBD Park Ridge Bank.

Keevan D. Morgan, Durkin, Morgan, Roberts Barnett & Bley, Chicago, IL, for Success Nat. Bank of Lincolnshire f/k/a First Nat. Bank of Lincolnshire.

Mark S. Lieberman, Rosenthal & Schanfield, P.C., Chicago, IL, for debtor.

Katy Gleason, Dept. of Justice, Chicago, IL, for United States Trustee.

## AMENDED MEMORANDUM OPINION

RONALD S. BARLIANT, Bankruptcy Judge.

An automobile dealer financed the purchase and operation of its dealership with loan proceeds from two secured creditors. After filing a voluntary petition under chapter 11, the Debtor sold all of its dealership assets to another automobile dealer. Included as part of the sales proceeds is $125,000 paid for the Debtor's voluntary termination of its franchise agreement. The Debtor has filed a motion for summary judgment to declare that the $125,000 is unencumbered. For the reasons stated below, this Court will deny the Debtor's motion.

### I. BACKGROUND

In March, 1991, SRJ Enterprises, Inc., (the "Debtor") acquired a Nissan franchise and entered into a floor planning financing arrangement with NBD Park Ridge Bank ("NBD") to purchase new vehicle inventory for its dealership. Later that year, the Debtor obtained additional financing from

Success National Bank of Lincolnshire ("Success"). A year after opening, the Debtor closed its doors. In March, 1992, the Debtor voluntarily filed for relief under chapter 11.

After filing the case, the Debtor sought a buyer for its dealership assets. In May, 1992, the Debtor filed a motion in this Court for an order approving the sale of the Debtor's assets to The Bob Rohrman Automobile Dealerships, n/k/a Rohr–Grove Motors, Inc. ("Rohrman"). The Debtor's motion included the following chart characterizing the sale:

| Collateral To Be Sold | Price To Be Paid |
|---|---|
| 55 New and Demonstration 1992 Nissan Automobiles, including Pathfinder Automobiles | $ 789,000.00 |
| 1 New 1991 Nissan Automobile | $ 19,000.00 |
| 8 New 1992 Nissan Pickup Trucks | $ 85,000.00 |
| 31 Used Automobiles | $ 185,000.00 |
| Nissan Parts In Stock | $ 80,000.00 |
| Good Will In Nissan Agreement | $ 125,000.00 |
| **Total Purchase Price** | $ **1,283,000.00** |

The Debtor subsequently amended its motion by deleting any reference to and disclaiming the sale of "good will". In June, 1992, this Court entered an order authorizing the sale to Rohrman. The order also indicated that the Debtor voluntarily would terminate its Nissan franchise upon the receipt of $125,000 from Rohrman. That is the amount characterized in the Debtor's original motion as the price for "Good Will in Nissan Agreement" and in the amended motion as "consideration of SRJ voluntarily terminating its Nissan Agreement in order that Rohrman may apply to obtain a new franchise agreement with Nissan." The order further provided that the sale to Rohrman was contingent upon Rohrman obtaining a Nissan franchise. Nissan later approved Rohrman as an authorized Nissan dealer at the Debtor's business location and the sale closed in September, 1992. At closing, Rohrman paid a total of $1,382,256.88, reflecting a price adjustment for additional "parts".

At issue in this proceeding is whether the $125,000 payment to the Debtor for the voluntary termination of its franchise (the "Termination Fee") is unencumbered or, instead, subject to the perfected security interest of NBD or Success. The relevant portion of NBD's security interest covers "accounts receivable (including, but not limited to, factory receivables), contract rights and any other personal property of Debtor now owned or hereafter acquired, and in all of the proceeds thereof." (Debtor's Statement of Uncontested Facts ¶ 6). Success' security interest similarly covers "(a) all Accounts, Accounts Receivable and Contract Rights of Debtor, whether now or hereafter existing or acquired; ...; (d) all general intangibles; and (e) all proceeds and products of the foregoing." (Debtor's Statement of Uncontested Facts ¶ 8). The Debtor filed a motion for summary judgment to declare the Termination Fee unencumbered. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(K).

## II. *ANALYSIS*

In order for the Debtor to prevail, the Termination Fee must be proceeds of newly created post-petition value or proceeds of unencumbered, pre-petition value. If the Termination Fee is proceeds of *post-petition* value, then section 552 of the Bankruptcy Code proscribes the reach of NBD's

and Success' respective security interests.[1] If, however, the Termination Fee is proceeds of *pre-petition* value, this Court must describe the pre-petition property interest and determine whether it is subject to a lien. The lenders' initial arguments must be disposed of before we can focus on this inquiry.

Success fails to distinguish between pre-petition and post-petition general intangibles, arguing that it has the priority lien on the Termination Fee by reason of its security interest in general intangibles and citing *Matter of Schmaling*, 783 F.2d 680 (7th Cir.1986). In *Schmaling*, the Seventh Circuit addressed the proper characterization of government payment-in-kind ("PIK") subsidies paid in exchange for farmers' forbearance in planting their crops. Rejecting the notion that PIK payments constituted "proceeds" of unplanted crops, the Court noted that "[t]he bank could presumably have acquired an interest in PIK revenues either by referring to government entitlements directly or by including a reference to general intangibles or to contract rights." *Id.* at 684. The "general intangible" recognized by the Seventh Circuit, however, referred to a farmer's *pre-petition* contractual right to PIK subsidies from the government. *Id.* at 683. Thus, Success' reliance on the reference in *Schmaling* to "general intangibles" is faulty because the analogous general intangible or contract right in this case is the contract with Rohrman that occurred *post-petition*. Therefore, *Schmaling* does not help Success to the extent that the Termination Fee represents proceeds of a post-petition general intangible. *See* § 552.

NBD counters that it has the priority lien on the Termination Fee because of its lien on "contract rights". Instead of focussing on the post-petition contract with Rohrman, NBD argues that the Termination Fee is proceeds of a "contract right" arising out of the Debtor's exercise of its *pre-petition* contractual termination right. NBD bases its argument on the Illinois Code Comment to the 1972 Commercial Code. The Comment states that the term "contract right" is covered by the two remaining categories of "account" and "general intangibles". *See* Illinois Code Comment, Ill.Rev.Stat., ch. 26, § 9–106. NBD broadly interprets this comment to conclude that the Debtor's contractual termination right is a type of general intangible formerly defined as a "contract right". NBD's argument equates contractual rights with the term "contract right", a reading inconsistent with the texts of the 1962 and 1972 Illinois Commercial Codes.

Under the 1962 Commercial Code, "contract right" meant "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper" and "account" meant "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." The 1972 amendments deleted the term "contract right" and amended the definition of "account" by adding the phrase "whether or not it has been earned by performance". The result is that the former 1962 "contract right" is now included in the definition of "account", except rights to payment other than for goods sold or leased or for services rendered; those rights are general intangibles. *See In re Gordon Car and Truck Rental*

---

1. Section 552, 11 U.S.C. § 552, provides:
   (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
   (b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

*Inc.*, 80 B.R. 12, 15 (N.D.N.Y.1987), *quoting* Hawkland, Lord & Lewis, U.C.C. Series § 9–106:02 (Art. 9) (1986). Here, the Termination Fee is not proceeds of a pre-petition "right to payment" of any kind. NBD's argument effectively converts "contract right" from a 1962 Commercial Code term of art into a catch-all term for any "contractual right", contrary to the Official Comment for both the 1962 and 1972 texts. See § 9–106 Official Comment (" 'general intangibles' brings under this Article *miscellaneous types of contractual rights* ") (emphasis added). *See also In re Scheidmantel Olds–Cadillac, Inc.*, 144 B.R. 296, 297 (Bankr.W.D.Pa.1992) (Cadillac dealership agreement was "general intangible", not "account" or "contract right").

If the words "contract rights" are given the 1962 Commercial Code meaning, then outside bankruptcy NBD could have a lien on the right to payment under the Rohrman purchase agreement. This characterization cannot help NBD, however, for the same reason that characterizing the Rohrman contract as a general intangible could not help Success—the Rohrman contract occurred post-petition. *See* § 552. It is possible, however, that the term "contract rights", as used in the NBD documents, (including the pre-petition right to terminate the franchise) means any "contractual rights" and is not to be restricted by the 1962 Commercial Code definition. If so, and if, as discussed below, the Termination Fee constitutes proceeds of franchise rights, then NBD may have the priority lien on the Termination Fee as proceeds of pre-petition "contract rights" [2].

The proper inquiries then are whether the Termination Fee represents proceeds of *pre-petition* value and whether that value is encumbered. It is uncontested that Rohrman agreed to pay the Debtor the sum of $125,000 in consideration of the Debtor's voluntary termination of its Nissan franchise so that Rohrman might apply to obtain a new franchise agreement with Nissan. (Debtor's Statement of Uncontested Facts ¶ 12). NBD claims that the Debtor held a valuable pre-petition right to terminate the franchise agreement, for which Rohrman paid $125,000. (NBD Response at 12). Success similarly urges that the termination right had value pre-petition because any subsequent franchisee could not acquire a new Nissan franchise before the Debtor terminated its franchise agreement. (Success Response at 7). The Debtor, however, argues that the Termination Fee represents post-petition value, as it was paid to "exercise its rejection powers so as to free up the purchaser's right to operate a Nissan dealership in Debtor's primary market area." (Debtor's Reply at 4).

The Debtor relies primarily on *In re Tek–Aids Industries, Inc.*, 145 B.R. 253 (Bankr.N.D.Ill.1992). Contrary to the Debtor's assertion, the facts of this case do not resemble those of *Tek–Aids*. In *Tek–Aids*, the court ruled that proceeds from a preference action could not be subject to a pre-petition security interest because the preference action could not exist pre-petition. *Id.* at 256. Here, the Debtor received compensation for the voluntary termination of its franchise, the exercise of a power (if not a right) that existed pre-petition. More fundamentally, notwithstanding language in the court order approving the sale to the contrary, the Debtor did not "terminate" the franchise agreement pursuant to § 365 of the Bankruptcy Code. Rejection under § 365 constitutes "breach", not termination, of a contract. *See* § 365(g). But for the fact that the Debtor had a termination *right* under § 12.E of its franchise agreement, rejection under § 365 could have resulted in a claim by Nissan for damages resulting from the Debtor's breach. Instead, the Debtor terminated the franchise in accordance with the agreement, as evidenced by this Court's order approving the sale: "the post-termi-

---

**2.** NBD also asserts a priority lien on "any other personal property" of the Debtor. Whether this additional grant is sufficient to give NBD a priority lien on the Termination Fee or whether "contract rights" alone is sufficient are questions to be resolved in a proceeding between the two competing creditors, NBD and Success. But this inter-creditor dispute is irrelevant for purposes of the Debtor's pending motion for summary judgment as long as either NBD or Success has a lien on the Termination Fee.

nation rights and obligations of the parties to the Nissan Dealership Agreement pursuant to Section 13 thereof shall survive the termination of the Nissan Dealership Agreement." (Order Approving Sale at ¶ 6). Therefore, it cannot be said that the $125,000 represents proceeds from the exercise of a right created by the Bankruptcy Code.[3]

Though the Termination Fee may represent proceeds of some type of pre-petition value, the Debtor constructs a two-part argument to conclude that the Termination Fee is unencumbered. According to the Debtor, the Termination Fee cannot represent proceeds of the franchise because the Debtor did not assign the franchise agreement to Rohrman. Second, because the Debtor technically did not transfer the franchise agreement, the Termination Fee may be proceeds of something, but not proceeds of pre-petition collateral. Both arguments fail for essentially the same reason—Rohrman paid $125,000 to the Debtor to acquire a Nissan franchise in the Debtor's market area.

■ The Debtor's initial claim, that the Termination Fee is not proceeds of the Debtor's franchise, places form over substance. Rohrman was not obligated to purchase the Debtor's assets unless approved as a new Nissan franchisee. Nissan's grant of a new franchise to Rohrman was conditioned upon the Debtor's termination of its franchise agreement. So, the Debtor surrendered the franchise to Nissan. Then, Rohrman procured a new franchise from Nissan to operate *in the Debtor's former market.* Nissan did not buy the franchise from the Debtor and then sell the franchise to Rohrman. Nissan simply was the conduit through which the franchise rights passed. The value to Rohrman of obtaining the franchise, separate from the hard collateral, is the upper threshold of the price that Rohrman would be willing to pay for the termination of the Debtor's franchise agreement[4]. Because this value previously belonged to the Debtor, as franchisee, the Termination Fee represents consideration paid for the "disposition" of the franchise, and therefore, either proceeds of NBD's lien on "contract rights" or "any other personal property", or Success' lien on "general intangibles". Section 9–306(1) of the Illinois Commercial Code defines "proceeds" as "whatever is received upon the sale, exchange, collection or *other disposition* of collateral or proceeds...." Ill. Rev.Stat., ch. 26, § 9–306(1) (emphasis added). There is no requirement that the collateral be transferred or disposed of to anyone; rather, "proceeds" include any amount received for disposition of collateral, even if disposition is by termination.

■ Section 17.I of the Debtor's franchise agreement, however, provides that the Debtor "shall not transfer or assign any right ... under this Agreement without the prior written approval of [Nissan].

**3.** Similarly unpersuasive is the Debtor's related argument that Rohrman paid a premium to extricate the franchise from these bankruptcy proceedings. No amount of premium could change the fact that this Court's approval of the Rohrman transaction was necessary to extricate the franchise rights from bankruptcy. This process could not be sped up by the payment of a premium to anyone.

**4.** At one time in this case, characterizing this "value" as proceeds of "goodwill" appeared to be a foregone conclusion. Indeed, as set forth above, the Debtor's original motion for an order approving the sale to Rohrman included a chart showing the "collateral to be sold" and the corresponding "price to be paid". The last item on this chart is entitled "Good Will In Nissan Agreement" and the corresponding price is shown as "$125,000". In other pleadings, NBD also characterized the sale to Rohrman as in-

cluding the sale of goodwill. Now, neither is advancing this argument. In fact, the Debtor amended its motion to disclaim any sale of goodwill. The reasons are obvious. From the Debtor's perspective, if the $125,000 represents proceeds from the sale of goodwill, then either Success or NBD, or both, have a lien on proceeds of a general intangible. From NBD's perspective, its claim to the $125,000 is stronger if the $125,000 is characterized as proceeds of a "contract right" since NBD's security agreement clearly grants security in "contract rights" and does not use the term "general intangibles." As discussed, while it may be convenient to characterize the Termination Fee as proceeds of "goodwill", it is not necessary to do so. *Cf. In re Hengalo Enterprises, Inc.,* 51 B.R. 54, 55 (Bankr. S.D. Fla.1985) (lien on general intangibles includes proceeds from outright sale of automobile franchise).

Any purported transfer, assignment or delegation made without the prior written approval of [Nissan] shall be null and void." It is unclear whether this prohibition encompasses security interests and, if so, whether it would be effective to avoid a consensual lien. *See generally In re Rainbo Express, Inc.*, 179 F.2d 1, 5 (7th Cir.) *cert. denied*, 339 U.S. 981, 70 S.Ct. 1029, 94 L.Ed. 1385 (1950) (I.C.C. license, if capable of passing to the trustee as property of the estate, may be subject to security interest notwithstanding right of I.C.C. to approve any subsequent transferee); *Hengalo*, 51 B.R. at 55 (proceeds from sale of automobile franchise agreements are proceeds of general intangible, notwithstanding state law restrictions on transfer).[5]

The problem faced by automobile dealership lenders arguably prohibited from taking security in a franchise agreement is closely analogous to that incurred by financiers of broadcast companies. Two recent bankruptcy cases have involved the interplay between the F.C.C. "no-lien" policy and a trustee's avoiding powers in bankruptcy[6]. In both cases, *In re Tak Communications, Inc.*, 138 B.R. 568 (W.D.Wis. 1992) and *In re Ridgely Communications, Inc.*, 139 B.R. 374 (Bankr.D.Md.1992), the secured lenders claimed perfected security interests in the proceeds from the sale of F.C.C. licenses. The *Tak* court adopted a deductive approach in declaring the license proceeds unencumbered. The lender could not lien the F.C.C. license by law; therefore, the proceeds were unencumbered as proceeds of unencumbered collateral. The *Tak* court further rejected the creditors' argument that they held a " 'limited' secu-

rity interest in the proceeds from the sale of the license". *Tak* at 577.

The *Ridgely* court took a more intuitive approach, notwithstanding the "no-lien" prohibition. "The right to transfer a license is a right between the F.C.C. and the licensee; the right to receive remuneration for the transfer is a right with respect to the two private parties." *Ridgely* at 378–79. Reconciling its holding with the prohibition against liens on the license, the *Ridgely* court reasoned that the only lien right arising out of the lien on the license in that case "is the right of the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer." *Id.* at 379. The *Ridgely* court acknowledged that the creditor was not entitled to foreclose on the license or to compel the transfer of the license, as "[t]hese are rights of the licensee vis-a-vis the F.C.C. and may not be abrogated by agreement." *Id.*

■ If this Court adopted the *Tak* reasoning, proceeds from the termination of Debtor's franchise would be unencumbered because the Nissan franchise agreement arguably could not be subject to a lien. If this Court adopted the *Ridgely* analysis, the "no-lien" franchise agreement would be deemed ineffective to deprive either NBD or Success of a lien against proceeds from the sale to Rohrman[7]. But these two approaches are not the exclusive means to resolve the problem presented by a "no-lien" franchise. This Court believes that a secured lender can protect itself by taking

---

5. No party addressed the Illinois statutory prohibition on unreasonable dealer or franchise restrictions: "[i]t shall be unlawful directly or indirectly to impose unreasonable restrictions on the motor vehicle dealer or franchisee relative to transfer, sale, right to renew, termination, discipline, non-competition covenants, site-control ..., right of first refusal to purchase, option to purchase, compliance with subjective standards and assertion of legal or equitable rights." Ill.Rev.Stat., ch. 121½ ¶ 757.

6. *See generally* Rosenblum, *Structuring and Restructuring Secured Loans to Broadcasters*, 1 J. Bank. L. & P. 271, 275 (1992) (F.C.C. currently reviewing its "no-lien" policy).

7. Days before the issuance of this opinion the Seventh Circuit affirmed Judge Crabb's holding in *Tak* and declined to adopt the rationale of *Ridgely*. *Matter of Tak Communications, Inc.*, 985 F.2d 916, (7th Cir.1993) (Rovner, J.). But, as discussed in the remainder of this Opinion, neither *Tak* nor *Ridgely* addressed whether a secured creditor could have an *independent* lien on its borrower's market share value *without* a lien on a F.C.C. license. Moreover, policy concerns regarding the F.C.C. "no-lien" position are inapplicable in the context of an automobile franchise. *See, above, pages 938–39.*

a lien either in the inherent value in the franchise or in general intangibles. *See Freightliner Market Dev. v. Silver Wheel Freight.*, 823 F.2d 362, 369 (9th Cir.1987) (transferability of license is irrelevant where creditor has a lien on general intangibles; "[i]f the rights produce proceeds, those rights are in fact 'property'"); *see also In re Mid–West Motors, Inc.*, 82 B.R. 439, 441–42 (Bankr.N.D.Tex.1988) (payment for covenant not to compete constitutes proceeds of goodwill, a general intangible).

An automobile floor planning financier may contemplate a bankruptcy filing by its borrower and take security in the inherent value of its borrower's market share. There is no reason why this value, or general intangibles such as goodwill and going concern value, cannot be deemed collateral *separate* from and *derivative* of the franchise. Obviously, a broader security interest in the automobile franchise would subsume these intangible interests and enable foreclosure of the dealership, but only if such security is available. But when the dealership is sold post-petition and an independent security interest in the Debtor's market share value is recognized, it becomes irrelevant whether the Nissan franchise itself could be subject to a lien. *Cf. Continental Bank, N.A. v. Everett*, 964 F.2d 701, 704 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992) (inability to lien F.C.C. license "irrelevant" where lender had security interest in income stream enjoyed by owner of license).

For the contrary conclusion that the Termination Fee represents an unencumbered "premium" paid for the Debtor's agreement to leave the marketplace, the Debtor cites *In re Oklahoma City Broadcasting Company*, 112 B.R. 425 (Bankr. W.D.Okla.1990). In *Oklahoma City*, the debtor operated a television broadcasting company. The debtor granted its creditor a lien on all of its assets, except its F.C.C. broadcasting license. The secured creditor sought to determine the amount of its allowed secured claim. As evidence of the value of the debtor's business, the creditor submitted an option contract showing a competing company's willingness to pay $1,835,000 to buy the debtor's hard assets, plus $1,165,000 to terminate the debtor's license and thereby reduce competition. Because the creditor did not have a security interest in the F.C.C. license, the court acknowledged that the only way the creditor could have a security interest in what it called the $1,165,000 "Bounty" is if "the Bounty or the rights from which the Bounty arise are included within Debtor's general intangibles." *Id.* at 429–30. The court then summarily concluded that "where the Bounty is being offered to take Debtor off the air, it is not a general intangible." *Id.* at 430.

It appears that the court in *Oklahoma City* was willing to recognize that the "Bounty" could be viewed as collateral, or proceeds of collateral, independent or derivative of the Debtor's unencumbered F.C.C. license. To this extent, *Oklahoma City* is distinguishable from *Tak*. The problem with *Oklahoma City*, however, is that it at once recognizes that certain value exists but nevertheless concludes that the value is nondescript and cannot be deemed a "general intangible". This Court disagrees. Indeed, the very point of having a category of "general intangibles" subject to encumbrance is to make available for financing purposes values not otherwise attributable to other categories of assets. To the extent that the purchaser in *Oklahoma City* paid money to acquire market share, the debtor gave up something of value, the type of miscellaneous intangible property contemplated by the residual collateral category of "general intangible." *See* Ill.Rev. Stat., ch. 26, § 9–106. The contrary conclusion reached in *Oklahoma City* means that certain types of valuable property vanish into a black hole, unable to be financed or encumbered, only to emerge unencumbered and transferable. See Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, ¶ 1.03[2], n. 71.3 (1992 Cum.Supp. No. 3) (*Oklahoma City* fails to recognize that the term "general intangibles" is residual in nature.) Therefore, the reasoning of *Oklahoma City* is unpersuasive—Rohrman paid $125,000 to induce the

Debtor to surrender valuable intangible rights evidenced by the franchise agreement, value that can be encumbered as an intangible property right.

This value, whether labelled "goodwill", "going concern value" or, more aptly, "market share value", existed pre-petition at the time the Debtor filed for relief. Indeed, this market share value represented by the Nissan franchise became an asset of the estate much like the Nissan automobiles. Recognizing the inherent market share value as prepetition collateral comports with § 552 of the Bankruptcy Code. Section 552 preserves to a great extent the status quo and protects state law property entitlements that existed as of the date of the filing. New, post-petition value is unencumbered. Old value is subject to perfected, pre-petition security interests in that value.[8] Here, the Debtor's market share value constitutes pre-petition intangible property. The Rohrman purchase contract and the Termination Fee constitute proceeds of that intangible. *See generally* 2 Gilmore, *Security Interests in Personal Property* § 45.5, at 1306 (1965) ("[f]uture 'contract rights' (no contract having yet been 'made') may be present 'general intangibles'. . . .").

## III. *CONCLUSION*

The Termination Fee represents how much Rohrman was willing to pay to acquire a Nissan franchise at the Debtor's place of business. This inherent market share value existed pre-petition and, as an intangible property interest, became property of the estate. The Termination Fee represents proceeds of that property. NBD holds a security interest on "contract rights" and a residual security interest in "any other personal property" of the Debtor. Success' security interest specifically includes "general intangibles". Between NBD and Success, the Termination Fee is encumbered; however, it is unnecessary at this time to determine the scope of NBD's security interest or any priority dispute between NBD and Success. For the foregoing reasons, this Court will deny the Debtor's motion for summary judgment to declare the Termination Fee unencumbered.

An appropriate order has been entered.

---

*Furniture and Appliances, Inc.,* 804 F.2d 87 (7th Cir.1986) (where inventory financier lacks security interest in "going concern value", security interest in inventory is limited to wholesale value) (Easterbrook, J., concurring).