**In re Thomas R. GRIFFITH, SSN # 442–76–3085, Dawn A. Griffith, SSN # 448–64–6389, Debtors.**

**Kenneth G.M. MATHER, Trustee, Plaintiff,**

**v.**

**BORDEN, INC., a Corporation, Defendant.**

**Bankruptcy No. 94–71139.**

**Adv. No. 95–7031.**

United States Bankruptcy Court, E.D. Oklahoma.

March 27, 1996.

---

Mark A. Craige, Morrel, West, Saffa, Craige & Hicks, Inc., Tulsa, OK, for Plaintiff.

Bradford S. Baker, Tulsa, OK, for Defendant.

### ORDER

TOM R. CORNISH, Bankruptcy Judge.

This matter comes before the Court on the complaint filed by the Trustee to recover a preferential transfer. The parties have waived a trial and have agreed that the Court could decide this proceeding based exclusively on the pleadings filed, stipulations and memoranda of law. The pivotal issues for the Court to decide are whether Borden, Inc. ("Borden") has a security interest in a covenant not to compete and whether the Trustee can recover the proceeds received from the covenant not to compete as a preferential transfer. Today, we hold that Borden has a perfected security interest in the covenant not to compete, and thus, the Trustee has not proven a preferential transfer.

### FINDINGS OF FACT

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

2. On July 12, 1990, one of the Debtors, Thomas Griffith, signed a Distributorship Agreement and a Security Agreement with Borden. The Security Agreement provided that Borden would have a security interest in all inventory, accounts receivables, all goods, instruments, documents of title, policies and certificates of insurance, chattel paper, deposits, money or other property owned by the debtor or which the debtor acquires an interest and the proceeds from the items set forth. The Security Agreement defines a receivable as "accounts, accounts receivable, contract rights, chattel paper, general intangibles, notes, drafts, acceptances and other forms of obligations and receivables now owned or hereafter acquired by the DEBTOR, whether now existing or hereafter arising and whether or not specifically assigned to Borden."

3. On July 19, 1990, a UCC–1 financing statement was filed in Oklahoma County. The financing statement covered the following property:

All milk and dairy products and other products sold and/or delivered by Borden, Inc. And all proceeds, accounts and notes receivable and contract rights presently in existence or hereafter created resulting therefrom, including all rights of action thereon accrued or hereafter to accrue.

4. In May, 1994, the Debtor was indebted to Borden in the sum of $60,063.25, plus accrued interest. The debt was incurred in

**264**

the ordinary course of business of the Debtor and Borden.

5.  On May 14, 1994, the Debtor and Hiland Dairy Company ("Hiland") executed an Agreement for the Purchase of Dairy Distributorship. The Agreement provided, in pertinent part, as follows:

> On June 10, 1994, Buyers [Hiland] also agree to pay SEVEN–THOUSAND FIVE–HUNDRED DOLLARS ($7,500.00) to Sellers [Debtors] in consideration for which Sellers covenant and agree that neither of them will, directly or indirectly, sell dairy products or any products competing with the products of the Buyer, or any company in direct competition with the Buyer, in any of the area being covered by the routes which are being transferred and sole to Buyer as described herein, for a period of three (3) years following the 10th day of June, 1994.

6.  Hiland prepared three checks which were sent to Hiland's attorney in Tulsa. Check No. 72270 dated June 2, 1994 in the amount of $2,387.26 was payable to Borden, Inc. and Randy Griffith for the inventory. Check No. 73405 dated June 14, 1994 in the amount of $1,693.27 was payable to Borden, Inc. and Randy Griffith for inventory. Check No. 73449 dated June 14, 1994, in the amount of $7,500.00 was payable to Randy Griffith for a covenant not to compete.

7.  On June 2, 1994, a Petition for Indebtedness and Application for Prejudgment/Garnishment/Replevin was filed in Case No. CJ–94–2259 in the District Court of Tulsa County. Summons was also issued on that date, which was directed to both Hiland Dairy and Thomas Griffith. Hiland was served on June 6, 1994. A Garnishment Notice and Affidavit were issued on June 2, 1994.

8.  On June 16, 1994, the Debtor, Thomas Griffith, filed an Objection to the Application for Prejudgment Attachment, Garnishment and/or Replevin. On July 13, 1994, Hiland filed an Interpleader seeking to pay the disputed funds into the Court. A hearing was held on July 27, 1994, at which time, Hiland paid $11,580.53 into the registry of the Court with one check dated July 12, 1994. As a result of that hearing, the state court issued an Order which sustained Hiland's interpleader and granted Borden's Application for Prejudgment Attachment, Garnishment or Replevin with a bond. Hiland was never served with any pleading issued by the Court Clerk of Tulsa County. Borden was paid the sum of $11,580.53 by the Tulsa County Court Clerk on July 27, 1994.

9.  This Bankruptcy case was filed on September 12, 1994.

10. Borden has no other security interest or mortgage in any property except as set forth in its Security Agreement. The bankruptcy estate has no other assets to distribute other than those which may be recovered from this adversary proceeding.

11. At the time the $11,580.52 was paid to Borden, the Debtor was insolvent.

12. Borden has a perfected security interest in the $4,080.53 received from Hiland but the Trustee claims that Borden's security interest in the $7,500.00 for the covenant not to compete is not perfected and is property of the bankruptcy estate.

13. The parties stipulate that Theodore P. Gibson, attorney at law, would testify as an expert witness that Borden's UCC–1 financing statement is sufficient to perfect Borden's security interest in the $7,500.00 due from Hiland for the covenant not to compete.

14. The parties further stipulate that Charlotte Colberg, former employee of Borden, Inc. would testify that she was involved in the preparation and execution of the distributorship and security agreements and financing statements between Borden and the Debtor. She believes it was the intent of Borden and the Debtor in 1990, to obtain a security interest in everything he owned and and everything that was or would be owed to him, including everything that Borden could legally attach as collateral. She would further testify that Griffith knew everything was covered as collateral. She would also testify in 1990, Borden exclusively used Don Hammer as their attorney to prepare UCC–1 financing statements and that he was instructed to prepare them to be sufficient to perfect their security interest in everything. Don Hammer is now deceased.

15. Richard Vaughn, a Borden territorial supervisor over the Debtor's area, would testify that he was instrumental in bringing Borden and the Debtor together. He would also testify that he explained to the Debtor that everything would be covered by Borden's security interest and that it was the intent of the parties to perfect Borden's security interest in everything, especially money to be paid from some third party like Hiland.

16. The parties agree that Rodney Crocker would testify that he is Borden's controller. He would further testify the Debtor knew the balance he owed Borden because of weekly or monthly settlement statements which were provided to the Debtor. Mr. Crocker would also testify that the Debtor was in default and owed Borden pursuant to the Security Agreement because of the Debtor's sale to Hiland. He would also testify that the collection of money from Hiland was made in the ordinary course of business of the Debtor and Borden and made according to ordinary business terms because it is standard in the industry to be paid at the time of a transfer of a distributorship.

17. The parties further agree that George Streetman would testify that he is the district sales manager for Borden and executed the Security Agreement. He would further testify that it was the intent of the parties, which was known to Griffith, that the Security Agreement and financing statement would perfect Borden's security interest in everything, including any monies owed to the Debtor from third parties. Also, Mr. Streetman would testify that the Security Agreement provides that the Debtor must obtain Borden's permission and pay Borden at the time he transfers his distributorship and this provision is standard in the industry. He would further testify that he sent a letter to the Debtor reminding him of this provision in early 1994 and that on or about May 20, 1994, he faxed a notice to Hiland Dairy serving actual notice of Borden's security interest in "all monies now due or in the future due to Mr. Griffith." This notice directed all monies be paid directly to Borden and notified Hiland that "Failure to remit any monies now due or in the future due to Mr. Griffith contrary to this notice shall be subject to the remedies afforded by law." He would further testify that the collection of the money from Hiland was made in the ordinary course of business of the Debtor and Borden, and was made according to ordinary business terms. As of May 20, 1994, Borden was in possession of the $7,500.00 due from Hiland to the Debtor because it was being held by Hiland as bailee for Borden.

18. The Trustee and attorney at law, Kenneth G.M. Mather, would testify as an expert witness that Borden's UCC-1 financing statement is not sufficient to perfect Borden's security interest in the $7,500.00 due from Hiland to the Debtor. He would further testify that the receipt of money by court proceedings is not in the ordinary course of business nor does it constitute the payment made upon ordinary business terms.

### CONCLUSIONS OF LAW

A. The first issue raised is whether this Court has jurisdiction over Borden. Borden previously filed a Motion to Dismiss this adversary proceeding on several grounds, one of which was lack of jurisdiction. This Court denied the Motion to Dismiss on June 16, 1995. Thus the Court will not revisit this issue.

B. The principal issue to be determined is whether Borden has a perfected security interest in the covenant not to compete. More specifically, was the description in the financing statement sufficient to cover the covenant not to compete? Whether a financing statement is sufficient against a trustee in bankruptcy is determined by state law. *Pongetti v. Deposit Guaranty Nat'l Bank (In re Strickland)*, 94 B.R. 898, 899 (Bankr.N.D.Miss.1988) (*citing 9 Anderson on the Uniform Commercial Code*, § 9–402:4 (3rd Ed.1985)). Okla.Stat.Ann. tit. 12A § 9–302 (West Supp.1996) provides that a financing statement must be filed to perfect all security interests except for some situations, which are not applicable in this case. Section 9–110 of title 12A of the Oklahoma Statutes provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

Okla.Stat.Ann. tit. 12A § 9–402(1) (West Supp.1996) provides, in pertinent part, that a financing statement is sufficient if it:

(1) gives the names of the debtor and the secured party;

(2) is signed by the debtor;

(3) gives an address of the secured party from which information concerning the security interest may be obtained;

(4) gives the mailing address of the debtor; and,

(5) contains a statement indicating the types, or describing the items, of collateral.

■■■ The Court must turn to case law to determine whether the description of the collateral in the financing statement reasonably identifies a "covenant not to compete." All that is required of a financing statement filed in order to give a party priority in the collateral is notice sufficient to ·place the inquiring party on guard to further inquire about the security interest. *Consol. Equip. Sales, Inc. v. First State Bank of Guthrie, Oklahoma,* 627 P.2d 432, 436 (Okla.1981) (*citing American Nat'l Bank & Trust Co. Of Sapulpa v. Nat'l Cash Register Co.,* 473 P.2d 234 (Okla. 1970)). The court in *Consolidated Equipment* looked to the official comment 2 to § 9–402 which provides:

This section adopts the system of "notice filing". . . . What is required to be filed is not, ... the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter.

Section 9–106 defines accounts and general intangibles, as follows:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

"General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, investment property, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts.

The covenant not to compete is a general intangible. *See, First City Nat'l Bank of Midland v. Mid–West Motors, Inc. (In re Mid–West Motors, Inc.),* 82 B.R. 439, 441 (Bankr.N.D.Tex.1988). The court in *Mid–West Motors,* relied upon the official comment to § 9–106 of the Uniform Commercial Code which provides that general intangibles include all types of contract rights and other personal property such as goodwill. *Id.* The court then concluded that covenants not to compete were general intangibles. *Id.* Thus, the issue becomes whether the financing statement which includes accounts, puts a third party on notice to inquire as to whether general intangibles are also part of the security agreement. In *In re Oklahoma City Broadcasting Co.,* 112 B.R. 425, 429–30 (Bankr.W.D.Okla.1990), Judge TeSelle held that a bounty to take the debtor off of the air was not a general intangible within the creditor's security interest. The Tenth Circuit in *Spears v. Michigan Nat'l Bank (In re Allen),* 888 F.2d 1299, 1302 (10th Cir.1989), held that the debtor's interest in a purchase and escrow agreement was a contract right and general intangible. The Trustee cites the Tenth Circuit case of *Johnson v. First Nat'l Bank of Howard (In re Fuqua),* 461 F.2d 1186 (10th Cir.1972), wherein the Tenth Circuit held that a financing statement covering "all personal property" did not comply with the statutory requirements. The financing statement in this case did not attempt to cover all personal property as it did in *Fuqua;* it specifically set out the types of its collateral. Thus, the *Fuqua* case is distinguishable from this proceeding.

C. In the instant case, Borden took a security interest in, via the Security Agreement, the inventory, accounts receivables, all goods, instruments, documents of title, policies and certificates of insurance, chattel paper, deposits, money or other property owned by the debtor or which the debtor acquires an interest and the proceeds from the items set forth. The UCC–1 only covers the milk and dairy products and other products sold and/or delivered by Borden and all proceeds, accounts and notes receivable, and contract rights presently in existence or

hereafter created. This Court must decide whether the financing statement would put a person, searching the records, on notice that general intangibles were part of Borden's collateral.

The financing statement at issue would place a third party on notice that a covenant not to compete is part of Borden's collateral. The covenant not to compete is a general intangible, which also includes contract rights. Although the financing statement does not specifically include general intangibles, it does cover contract rights. This Court finds that Borden's security interest in the covenant not to compete is perfected.

 D. The Trustee brought this action seeking to recover a preferential transfer pursuant to 11 U.S.C. § 547(b). In order to prevail in a preferential action case, the trustee must prove:

1. Transfer of an interest of the debtor in property;

2. To or for the benefit of a creditor;

3. For or on account of an antecedent debt owed by the debtor before such transfer was made;

4. Made while the debtor was insolvent;

5. Made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

6. That enables the creditor to receive more than such creditor would receive if the case were a case under chapter 7 of this title.

4 Collier on Bankruptcy para. 547.01 (15th ed. 1995).

In a preference action, the Trustee has the burden of proof that all elements of the statute have been satisfied. *Markowitz v. Heritage Bank, N.A. (In re Jefferson Mtg. Co.)*, 25 B.R. 963, 966 (Bankr.D.N.J.1982) (citations omitted). If the Trustee cannot prove that the transfer within the 90–day–period was "preferential", i.e. that it enabled a creditor of a certain class to receive more than he would otherwise, the transfer cannot be avoided. *Id.* The transfer can only be avoided if the secured party has not perfect-

ed its interest. *Id.* at 968. *See also, In re Kendrick & King Lumber, Inc.,* 14 B.R. 764, 765 (Bankr.W.D.Okla.1981).

In the instant case, the creditor has perfected its security interest in the covenant not to compete. Transfers to a fully secured creditor are not avoidable as preferences, since the secured claim would be satisfied in full in a chapter 7 liquidation. *Travelers Ins. Co. v. Cambridge Meridian Group (In re Erin Food Services, Inc.),* 980 F.2d 792, 803 (1st Cir.1992). As a result, the creditor did not receive more than it would have in a chapter 7 liquidation. Since the Trustee will be unable to prove all the elements of a preference action, there is no preferential transfer. Thus, judgment must be entered for the Defendant.

IT IS THEREFORE ORDERED that judgment is hereby **granted for the Defendant.**