# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: MAGNACOM WIRELESS, LLC,
                                    *Debtor,*

DONALD A. THACKER,
                            *Appellant,*

                v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,
                            *Appellees.*

No. 05-35839

D.C. No.
CV-04-05681-FDB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
June 7, 2007—Seattle, Washington

Filed September 17, 2007

Before: Betty B. Fletcher, Harry Pregerson, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

12463

## COUNSEL

Donald B. Verrilli, Jr. and William M. Hohengarten, Jenner & Block, LLP, Washington, D.C., for the plaintiff-appellant. John S. Riper and Joseph M. Campos, Stanislaw Ashbaugh, LLP, Seattle, Washington, for the trustee.

Peter D. Keisler, Assistant Attorney General, John McKay, United States Attorney, William Kanter, and H. Thomas Byron III, Department of Justice, Civil Division, Washington, D.C., for the defendants-appellees.

## OPINION

IKUTA, Circuit Judge:

This appeal requires us to consider the effect of the Federal Communications Commission's ("FCC") cancellation of licenses held by a licensee in bankruptcy proceedings. Donald Thacker, in his capacity as trustee to the bankruptcy estate of Magnacom Wireless, LLC ("Magnacom"), appeals the district court's decision to deny his claim to the proceeds from the FCC's auction of new licenses for the radio spectrum previ-

ously covered by Magnacom's cancelled licenses. We conclude that the FCC's cancellation of Magnacom's licenses extinguished Magnacom's interest in those licenses and the underlying spectrum. Such cancellation did not result in any traceable proceeds, and did not constitute a lien-enforcement remedy. Therefore, Magnacom is not entitled to such proceeds. We have jurisdiction under 28 U.S.C. § 158(d)(1) and affirm the decision of the district court.

## I.

Under the terms of the Communications Act of 1934 ("Act"), the FCC grants licenses for use of the radio spectrum. The licenses give licensees the right to use segments of the spectrum in various geographic areas for specified terms, in accordance with FCC provisions. *See* 47 U.S.C. § 301[1] Pursuant to the Act, the licenses do not give licensees an ownership interest in the spectrum. *Id.*

Beginning in 1994, the FCC began selling the licenses based on a competitive bidding process. *See id.* § 309(j). With exceptions not relevant to the instant case, all proceeds from these auctions are deposited into the U.S. Treasury. *Id.* § 309(j)(8). As part of this new market-driven licensing process, the Act requires the FCC to "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services. . . ." *Id.* § 309(j)(4)(D). To fulfill this mandate, the FCC

---

[1]47 U.S.C. § 301 states:

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license.

earmarks certain blocks of spectrum for auction to small, entrepreneurial companies known as "designated entities." 47 C.F.R. § 1.2110(a). Other license purchasers must pay the entire bid price at the time of the successful bid, but the FCC allows designated entities to pay only a down payment and then complete their purchase by making installment payments during the term of the license. 47 C.F.R. § 1.2110(g). FCC regulations condition these licenses upon "the full and timely performance of the licensee's payment obligations under the installment plan." 47 C.F.R. § 1.2110(g)(4); *see also* 47 C.F.R. § 1.2110(g)(4)(iv). Thus, in relation to designated entities, the FCC plays the dual role of regulator and creditor.

Magnacom, one such designated entity, was created for the purpose of obtaining licenses to the spectrum in order to provide personal communications services. In September 1996, Magnacom purchased a number of radio spectrum licenses from the FCC under an installment payment plan. Magnacom made down payments of ten percent of the purchase price for licenses to use "C block" spectrum segments and twenty percent of the purchase price for licenses to use "F Block" segments. In total, Magnacom paid approximately $7 million on a purchase price of approximately $55 million. For each license, Magnacom signed the FCC's standard promissory note and security agreement (the "Security Agreement"), promising to pay the rest of the purchase price in quarterly installments throughout the ten-year license term.

In the Security Agreement, Magnacom acknowledged: (1) it possessed no underlying right to the spectrum;[2] (2) the FCC's security interest in the licenses did not derogate from the FCC's regulatory authority over the licenses;[3] (3) the

---

[2]"Debtor understands and acknowledges that it holds a mere conditional license to use the Spectrum with no ownership interest in the Collateral (or any underlying right to use the Spectrum) . . . ." Security Agreement ¶ 2.

[3]"Debtor further understands and acknowledges that it is giving a security interest to the Commission in the Collateral only to assist the Commis-

licenses would be automatically cancelled if an event of default occurred;[4] (4) Magnacom would not be entitled to any proceeds from the sale of new licenses following cancellation;[5] and (5) the Security Agreement would be subject to the Act, FCC regulations, and federal law.[6]

Not long after purchasing its licenses, Magnacom began to experience financial difficulties. In an attempt to meet its

___

sion in protecting its ability to enforce the Commission's regulations which condition holding the license in compliance with all then-applicable orders and regulations of the Commission, including, but not limited to, full and timely payment of all payments under the Installment Payment Plan. To that end, and not in derogation of any of the Commission's regulatory authority over the License, Debtor hereby acknowledges that the Commission has a first security interest in the Collateral . . . ." Security Agreement ¶ 2.

[4]"If an Event of Default shall occur, the Commission shall thereafter have the following rights and remedies (to the extent permitted by applicable law) in addition to the rights and remedies relating to the Note, all such remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently at such time or times as Commission deems expedient: (a) the License shall be automatically canceled pursuant to 47 C.F.R. § 1.2110." Security Agreement ¶ 8.

[5]"Debtor hereby acknowledges the Commission's authority, pursuant to the Communications Act of 1934, as amended, and the Commission's orders and regulations then-applicable to such licenses, to conduct another public auction or assign the License in the event that the Commission rescinds, cancels, or revokes the License for any default under this Agreement . . . . Debtor further acknowledges that in the event that the Commission rescinds, cancels, or revokes the License for any default under this Agreement . . . Debtor has no right or interest in any moneys or evidence of indebtedness given to the Commission by a subsequent licensee of the Spectrum and that all such moneys or evidence of indebtedness are, and shall remain, the full property of the federal Treasury, pursuant to Section 309(j) of the Communications Act of 1934, as amended, and then-applicable commission orders and regulations." Security Agreement ¶ 8.

[6]"This Agreement shall be governed by and construed in accordance with Communications Act of 1934, as amended, then-applicable Commission orders and regulations, as amended, and federal law." Security Agreement ¶ 12.

installment payment obligations, Magnacom restructured its debt by returning some licenses to the FCC, modifying other licenses, and using the resulting down payment credits to pre-pay for other licenses. Following this restructuring, Magnacom held eighteen licenses subject to the installment payment requirements and owed the FCC approximately $48 million. Despite this restructuring, Magnacom's financial difficulties continued.

On October 28, 1998, the day before Magnacom would have defaulted on its remaining installment payments, Magnacom filed a voluntary petition for relief under Chapter 11. In response, on April 21, 1999, the FCC asked the bankruptcy court for relief from the automatic stay imposed by 11 U.S.C. § 362. The bankruptcy court granted the request. In May 1999, the court lifted the stay on the FCC and ruled that "the FCC may pursue immediately any and all of its remedies, including its right to cancel the Defaulted Licenses if such licenses have not already [been] canceled as a matter of law." Thereafter, the FCC cancelled the licenses. On July 12, 1999, Magnacom's bankruptcy case was converted from Chapter 11 to Chapter 7.

In January 2000, the FCC filed a proof of claim as an unsecured creditor to obtain the approximately $48 million dollars that the Magnacom bankruptcy estate still owed for the now-cancelled licenses. With the acquiescence of Magnacom's trustee, the court approved the FCC's proof of claim.

In 2001, while the FCC's claim against the bankruptcy estate was pending, the FCC auctioned licenses to the spectrum segments formerly licensed to Magnacom. *See* Public Notice, C and F Block Broadband PCS Spectrum Auction Scheduled for December 12, 2000, 15 F.C.C.R. 19485 (2000). The new licenses offered by the FCC for auction did not have the same terms as the cancelled Magnacom licenses. Among other things, the new licenses were for a new ten-year term ending in 2011 (Magnacom's licenses had been set to expire

in 2006 and 2007) and had different build-out construction deadlines. In addition, the FCC would not accept installment payments for the licenses. As it turned out, market conditions had changed since the time Magnacom had won its licenses at auction. The winning bidders in the 2001 auction paid a total purchase price of $287 million, substantially more than Magnacom had paid for licenses to the same spectrum segments. Pursuant to 47 U.S.C. § 309(j)(8), the proceeds of the auction were deposited into the U.S. Treasury.

In light of the subsequent sale of new licenses, on February 12, 2003, Magnacom's trustee filed a motion to reconsider the FCC's allowed claim against Magnacom's bankruptcy estate. In his motion, the trustee opposed the FCC's unsecured claim on the ground that the reauctioned licenses were sold for a substantially higher price than was required to cover Magnacom's default. Despite the FCC's opposition, the bankruptcy court granted this motion on September 2, 2003, holding that the FCC was not entitled to any distribution from the estate.

On December 19, 2003, the trustee filed a complaint against the FCC in bankruptcy court, seeking the return of any proceeds from the auction of the new licenses that exceeded the amount Magnacom owed to the FCC. The bankruptcy court dismissed the complaint for failure to state a claim upon which relief could be granted. The trustee appealed this decision to the district court, which affirmed the decision on June 22, 2005. The trustee now appeals the decision of the district court.

II.

We review a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo. *Pack v. United States*, 992 F.2d 955, 957 (9th Cir. 1993). Limiting our review to the content of the trustee's complaint, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Id.* Likewise,

"[w]e review the district court's decision on an appeal from a bankruptcy court *de novo*." *Richmond v. United States*, 172 F.3d 1099, 1101 (9th Cir. 1999) (quotation marks omitted).

### III.

The principal issue in this appeal is the legal effect of the FCC's cancellation of Magnacom's licenses. It is undisputed that Magnacom's licenses were cancelled following the bankruptcy court's original decision to lift the stay. What the parties debate is the effect of this cancellation. Magnacom's trustee argues that the cancellation and subsequent spectrum auction is subject to Bankruptcy Code and Uniform Commercial Code ("UCC") rules that give the Magnacom estate entitlement to surplus proceeds. The FCC argues that under applicable statutes and regulations, once the licenses were cancelled, they ceased to exist and any right in the underlying spectrum was extinguished. Therefore, the proceeds from the auction of the new licenses were not property of the bankruptcy estate.

**[1]** The plain language of the Act supports the FCC's position. Under 47 U.S.C. § 301, licenses "provide for the use" of the spectrum, "but not the ownership thereof." In other words, licensees have a property interest only in the use of the spectrum, not in the underlying spectrum itself. Moreover, § 301 provides that the property interest created by a license is limited to "the terms, conditions, and periods" of the license itself. *Id.* Consistent with the Act, the Security Agreement states that licenses are extinguished upon non-payment, and convey no rights to the underlying spectrum. *See* Security Agreement, ¶ 2; *see also* 47 C.F.R. § 1.2110(g)(4)(iv) ("If an eligible entity obligated to make installment payments fails to pay the total Required Installment Payment . . . it shall be in default, its license shall automatically cancel, and it will be subject to debt collection procedures."). Because licenses "provide for the use" of the spectrum and convey no ownership interest "beyond the terms, conditions, and periods of the

license," 47 U.S.C. § 301, it follows that once the licenses are cancelled for nonpayment, the licenses cease to exist along with any interest in the spectrum for which the license was issued. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307-08 (2003) (describing cancellation as "eliminating the licenses"). Thus, under the plain language of the statute and applicable regulations, once an FCC license is cancelled, a licensee no longer has any right derived from that license and therefore has no entitlement to the proceeds from the auction of a new license.[7]

[2] There is one wrinkle to this analysis, but it does not change the result in this case. Section 525 of Title 11 states that "a governmental unit may not . . . revoke . . . a license . . . to . . . a person that is . . . a debtor under this title . . . solely because such . . . debtor . . . has not paid a debt that is dischargeable in the case under this title . . . ." 11 U.S.C. § 525.[8] Applying § 525 in a factual situation similar to ours,

---

[7]The FCC explained its position on this issue in an opinion letter that addresses precisely the circumstance presented in this case:

> [I]t is our understanding that, where there is collateral in goods or other tangible property, the proceeds from the liquidation of collateral would be applied to debts (and other costs) due. In the case of FCC licenses that are cancelled and reauctioned, however, there is no liquidation of the collateral by the FCC and no proceeds from the resale of the defaulted license because the license is canceled and, in effect, disappears.

*Leonard J. Kennedy, Esq.*, 11 F.C.C.R. 21572, 21576 (OGC/WTB 1996) (citation omitted). This opinion letter does not have the force of law and is not entitled to any *Chevron* deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000). We find its analysis persuasive because, as explained above, licenses provide only for the use of the spectrum and convey no ownership interest beyond the license term. Once the licenses are cancelled for nonpayment, the licenses cease to exist.

[8]The full text of 11 U.S.C. § 525(a) reads:

> Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Depart-

the Supreme Court held that the FCC's regulatory authority to cancel licenses did not trump the provision of § 525; rather, the FCC was precluded from cancelling a license solely because of the licensee's failure to pay on a debt dischargeable in bankruptcy. *NextWave,* 537 U.S. at 304. Thus, the FCC's decision to cancel Magnacom's licenses for nonpayment would be subject to challenge under § 525.

[3] *NextWave* is not applicable here, however, because Magnacom's trustee does not challenge the FCC's cancellation of the licenses and does not seek relief based on § 525. Magnacom's trustee did not object to the FCC's motion for relief from the automatic stay to allow the FCC to cancel the licenses. Nor does the trustee now argue that the FCC's cancellation of the licenses violated § 525; in his opening brief trustee explicitly accepts the FCC's cancellation, stating that "Magnacom is not trying to recover its licenses or set aside their transfer to new licensees." Section 525 is not applicable when, as here, an entity does not challenge the cancellation of its license.[9]

_____

ment of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

[9]Besides noting that both Magnacom and the bankruptcy court had previously given their consent to the cancellation of the licenses, the bank-

IV.

Although the plain language of the statute and applicable regulations indicate that Magnacom had no entitlement to proceeds from a new auction, the trustee argues that cancellation did not eliminate the bankruptcy estate's right to collect surplus proceeds from the auction of new licenses covering the same spectrum. The trustee asserts that both the Bankruptcy Code and the UCC provide independent bases for the return of "surplus proceeds" from the second auction.

The trustee's argument under the Bankruptcy Code is as follows. Once Magnacom entered bankruptcy, its interests in the licenses, as well as the proceeds of those licenses, became property of the bankruptcy estate. 11 U.S.C. § 541(a)(1), (a)(6). The term "proceeds" includes all funds "traceable to" or "substituted for" the original property. *See* 11 U.S.C. § 541(a)(6). Because Magnacom's licenses gave it the exclusive right to use a portion of the spectrum, the FCC's cancellation of the Magnacom licenses freed up that portion of the spectrum. As a result, the trustee argues, the FCC was enabled to sell new licenses, and the proceeds from the sale of the new

_____

ruptcy court also rested its conclusion that § 525 was not applicable on the alternative basis that Magnacom was in Chapter 7 bankruptcy not Chapter 11 bankruptcy, unlike the debtor in *NextWave*, 537 U.S. at 297. Because debts of corporations are not dischargeable under Chapter 7 bankruptcy, § 525 would not be applicable in Magnacom's Chapter 7 case. *See* 11 U.S.C. § 727(a) ("The court shall grant the debtor a discharge, unless . . . the debtor is not an individual."); *see also NLRB v. Better Bldg. Supply Corp.*, 837 F.2d 377, 378 (9th Cir. 1988) ("Partnerships and corporations may not discharge their debts in a liquidation proceeding under Chapter 7 of the Code."). On this record, however, it is unclear whether the FCC cancelled the licenses while Magnacom's proceedings were in Chapter 11 or Chapter 7. Magnacom remained in Chapter 11 bankruptcy proceedings after the bankruptcy court lifted the stay, and the record does not reflect the date that the FCC cancelled the licenses. However, given the fact that § 525 is ultimately not relevant to the trustee's claim, we need not reach the bankruptcy court's alternative holding.

licenses are traceable proceeds of the cancelled Magnacom licenses, and thus property of the bankruptcy estate.

**[4]** We are unpersuaded by the trustee's argument based on the Bankruptcy Code. This argument is based on the premise that Magnacom retained an interest in the spectrum after the FCC cancelled its licenses, a premise we have already rejected. If a bankruptcy estate includes a valuable property interest that is sold, or swapped for a different piece of property, the proceeds remain part of the estate. *See Catalano v. Comm'r*, 279 F.3d 682, 686 (9th Cir. 2002). Thus, if the FCC had sold Magnacom's licenses, the Magnacom estate might have rights to proceeds from such a sale. Alternatively, if Magnacom retained rights to the spectrum covered by its licenses, the Magnacom estate might have rights to proceeds from the sale of new licenses to use the underlying spectrum. However, in this case, Magnacom's property—the licenses—were extinguished and had no value once they were cancelled by the FCC. And as we have previously noted, Magnacom had no interest in the underlying spectrum or any subsequent licenses for the spectrum. *See* 47 U.S.C. § 307(a). When the property of an estate no longer exists and has not been disposed of in any way that generated proceeds, the trustee has no remedy. *See generally* 44 George Gleason Bogert et al., The Law of Trusts and Trustees § 921 (6th ed. 2007). Here the licenses were extinguished and were simply not disposed of in any way.

**[5]** It is true that the FCC had to cancel Magnacom's licenses before the FCC could sell new licenses for the underlying spectrum. However, this fact alone does not give Magnacom any rights to proceeds from the new licenses. A creditor's lawful extinction of a property right in the bankruptcy estate does not give the trustee in bankruptcy rights to other property created by that creditor. *See In re Gull Air, Inc.*, 890 F.2d 1255, 1262 (1st Cir. 1989) ("[W]hen a debtor's proprietary interest expires by operation of an express condition, the Bankruptcy Code does not preserve that interest and

prevent termination."). Therefore, the FCC's sale of new licenses for the use of spectrum segments to which Magnacom had no rights did not generate any proceeds traceable to Magnacom's licenses.

We are also unpersuaded by the trustee's UCC argument. The trustee contends that the Security Agreement gave the FCC a security interest in the licenses that could be enforced only pursuant to the terms of the UCC. *See* Security Agreement, ¶ 8(i) (giving the FCC "any remedies of a Secured Party under the Uniform Commercial Code."). Article 9 of the UCC sets forth a secured creditor's lien-enforcement remedies. Under Article 9 of the UCC (subject to multiple procedural requirements), after a borrower defaults, the secured creditor may sell its collateral subject to the borrower's right to any surplus from the sale. UCC §§ 9-610, 9-615. If a creditor held a security interest in the proceeds of Magnacom's licenses, and the licenses had been sold, the creditor would have owed the Magnacom estate any proceeds beyond what was necessary to satisfy the debt owed to the creditor. *See MLQ Investors, L.P. v. Pac. Quadracasting, Inc.*, 146 F.3d 746, 749 (9th Cir. 1998). The trustee contends that the UCC likewise applies to the FCC's enforcement of the Security Agreement and requires the FCC to return the excess proceeds from its auction of new licenses to the bankruptcy estate.

If we assume that the UCC is applicable to the Security Agreement (an issue we do not reach), the UCC would support the trustee's claim of entitlement to proceeds from the FCC's sale of new licenses only if the FCC's cancellation of the licenses was a lien-enforcement remedy under the UCC. The trustee argues that both the applicable regulations and the Security Agreement make cancellation a lien-enforcement remedy. We look at both in turn.

**[6]** By its terms, the Security Agreement does not make cancellation a lien-enforcement remedy. However, the trustee

relies on *NextWave Personal Communications, Inc. v. F.C.C.,* 254 F.3d 130 (D.C. Cir. 2001), aff'd by, *NextWave*, 537 U.S. 293, to support this argument. As noted above, *NextWave Personal Communications, Inc.* involved a debtor who raised various challenges to the FCC's cancellation of its license, including the ultimately successful argument that § 525 prevented the FCC from cancelling its licenses. In response, the FCC made a highly technical argument. The FCC first pointed out that under 11 USC § 362(b)(4), the automatic stay does not prevent the government from taking certain regulatory actions. The FCC argued that such allowable regulatory actions include cancelling a debtor's licenses. If it interpreted § 525 as precluding the FCC from cancelling a debtor's licenses, the court would create a conflict with § 362(b)(4). The court rejected this argument on the ground that § 362(b)(4) did not apply to license cancellation in this case. The court noted the FCC's concession that "canceling the licenses and seeking to collect on the debt was 'tantamount to . . . foreclosing on collateral.' " *Id.* at 151. Because foreclosure actions are not exempt from the automatic stay under § 362(b)(4), the court concluded that it could read § 525 to prohibit the FCC from cancelling licenses without conflicting with § 362(b)(4). *Id.* We do not consider this brief discussion to be the D.C. Circuit's reasoned conclusion that cancellation of an FCC license is a lien-enforcement action. The D.C. Circuit's suggestion that § 362(b)(4) did not exempt the FCC's license cancellation from the automatic stay was based on the FCC's concession that its action was "tantamount to foreclosing on collateral." In our circuit, statements made in passing, without analysis, are not binding precedent. *See, e.g.*, *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001). Moreover, the D.C. Circuit's decision was superceded by the Supreme Court's analysis in *Nextwave*, which did not address the question whether license cancellation constituted lien enforcement. *NextWave*, 537 U.S. at 302. Therefore, we reject the trustee's argument that under the D.C. Circuit's *NextWave*

decision we must interpret the Security Agreement to make cancellation a lien-enforcement remedy.

The trustee also points to regulations governing the licenses that state that when a licensee misses an installment payment "it shall be in default, its license shall automatically cancel, *and* it will be subject to debt collection procedures." 47 C.F.R. § 1.2110(g)(4)(iv) (emphasis added). According to the trustee, the use of "and" suggests that cancellation triggers a hybrid regulatory and lien-enforcement action that is subject to typical debtor-creditor law. We read this language in the opposite way: after non-payment, the license is extinguished *and* the debtor will be held accountable for the unpaid licensee fees. *See Leonard J. Kennedy, Esq.*, 11 F.C.C.R. 21572, 21576. This is exactly how the FCC proceeded in this case: it took steps to obtain relief from the automatic stay in order to cancel Magnacom's licenses, and then proceeded to enforce its claims as an unsecured creditor in the bankruptcy proceedings.

Finally, we disagree with the trustee's reading of *NBD Park Ridge Bank v. SRJ Enterprises, Inc. (In re SRJ Enterprises, Inc.)*, 150 B.R. 933, 938 (Bankr. N.D. Ill. 1993), and its progeny to support the argument that because the FCC had a security interest in the licenses, its cancellation of those licenses must be deemed to be a lien-enforcement remedy. *In re SRJ Enterprises, Inc.* involved a debtor in Chapter 11 bankruptcy proceedings who sold his car dealership and, as part of the sales price, received a "termination fee" for voluntarily terminating his Nissan sales franchise. *Id.* at 935. Nissan would not have issued a new franchise to the buyer of the dealership until the debtor terminated the existing franchise. *Id.* The court determined that the creditor's security interest in "general intangibles" included a security interest in the termination fee received by the debtor. *Id.* at 939-40. In the course of reaching this conclusion, the court analogized to cases allowing lenders to enforce security interests in the proceeds from sales of FCC licenses, even though FCC did not

allow lenders to take a security interest in the licenses themselves. *Id.*

These cases do not help the trustee. Unlike our case, the debtor in *In re SRJ Enterprises, Inc.* owned a valuable right; the right to terminate its franchise agreement. The bankruptcy court merely held that a secured creditor had an interest in the proceeds derived from exercising that right. Similarly, secured creditors may take a security interest in the proceeds derived from licensees' exercise of their valuable right to sell or transfer their licenses. By contrast, Magnacom did not own a termination right or any other valuable right. Any value stemming from Magnacom's license was extinguished when the FCC unilaterally cancelled the license pursuant to its contractual and regulatory rights. Moreover, nothing in *In re SRJ Enterprises, Inc.* suggests that the FCC was required to enforce its security interest in the licenses, rather than merely cancelling them.

**[7]** We conclude that the trustee's UCC arguments are to no avail. The FCC had a regulatory and contractual right to cancel Magnacom's licenses. This right was separate and independent from the FCC's rights as a secured creditor. Nothing in the Security Agreement or the applicable regulations indicates that a license cancellation must be viewed as a lien-enforcement remedy, and we decline to do so. Because the FCC's license cancellation is not a UCC lien-enforcement remedy, the UCC's requirements are simply inapplicable. Therefore, even if the UCC were applicable to the Security Agreement, it would not entitle Magnacom to proceeds after its licenses were extinguished.[10]

---

[10]By the same token, the fact that a debtor's rights to surplus proceeds are unwaivable under U.C.C. § 9-602(4) is not relevant in this case. The FCC did not exercise its lien-enforcement remedies and did not sell collateral owned by Magnacom. Therefore, it received no surplus proceeds to which Magnacom was entitled.

**[8]** In sum, under 47 U.S.C. § 301, once Magnacom's licenses were cancelled by the FCC, Magnacom's licenses had no value and Magnacom's interest in the underlying spectrum was extinguished. This valueless asset could not generate any traceable proceeds for purposes of the Bankruptcy Code. Moreover, nothing in the Security Agreement or applicable law requires us to treat the FCC's license cancellation as a lien-enforcement proceeding subject to the UCC. Therefore, Magnacom had no entitlement to the proceeds from any subsequent sale of new licenses covering the same spectrum.

V.

Finally, the trustee argues that principles of issue preclusion and judicial estoppel barred the FCC from claiming that Magnacom was not entitled to the proceeds from the sale of new licenses for the spectrum covered by the Magnacom licenses.

The trustee's issue preclusion argument is based on the bankruptcy court's September 2, 2003 order disallowing the FCC's unsecured claim against the bankruptcy estate. In its order, the bankruptcy court indicated that the FCC was not entitled to recover the $48 million that Magnacom had failed to pay for the now-cancelled licenses because the FCC's claim had been satisfied by the sale of the new licenses. The court stated that it was "unconvinced by the FCC's argument that the claim may not be reconsidered because the licenses that it subsequently auctioned were different licenses than the ones previously held by the Debtor . . . . No matter how labeled, however, the FCC could not have auctioned these licenses to new users, *but for* the Debtor's default." *In re Magnacom Wireless, LLC*, No. 98-39048, at 5-6 (Bankr. W.D. Wa. Sept. 2, 2003) (memorandum decision on motion for reconsideration). However, in ultimately disallowing the FCC's claim, the court relied primarily on the FCC's policy statement that it would " 'forgive any outstanding debt so long as it has been made whole (penalties and costs included)

in a subsequent auction.' " *Id.* at 6 (quoting *Leonard J. Kennedy, Esq.*, 11 F.C.C.R. at 21576). The court concluded:

> Although the FCC disputes that it received a $238 million surplus from the subsequent auction of the licenses, the FCC has conceded that the proceeds from the subsequent auction exceed the amount of its claim against the Debtor's estate. If the Court were to accept the FCC's argument, the FCC would unquestionably receive a substantial windfall. Such a result would be contrary to the FCC's position as stated in the [policy] letter that it would "forgive outstanding debt so long as it has been made whole (penalties and costs included) in a subsequent auction." 11. F.C.C.R. at 21576. Prevention of such a double recovery to the harm of the Debtor's creditors and estate, particularly where the claimant has recognized in its own policy statements that such a result would be inequitable, is precisely the type of circumstance that Fed. R. Civ. P. 60(b)(5) or (6) should be utilized to prevent.

*Id.* at 7-8.

Moreover, although the bankruptcy court refused to allow the FCC to proceed against Magnacom, the court expressly did not conclude that Magnacom was entitled to proceeds from the FCC's sale of the new licenses. In this same order, the court stated that it "recognizes that the part[i]es have included briefing on issues that are not necessarily before the Court at this time. For example, the Movants are taking the position that the estate also has substantial claims against the FCC for the $238 million surplus. The Court simply concludes that the FCC is not entitled to any further claim against the estate for the $48,187,219.73." In a subsequent order, the bankruptcy court reiterated that it did not reach the issue of whether Magnacom was entitled to surplus proceeds. The court concluded that "[t]he issue decided by the Court in its

September 2, 2003 Decision was whether reconsideration of the FCC's claim was proper. The Court made it clear in its decision that this was the only issue before it, and that it was not making any rulings on whether the estate had any claim to the surplus proceeds." *In re Magnacom Wireless, LLC*, No. 98-39048, at 6 (Bankr. W.D. Wa. Oct. 5, 2004) (memorandum decision on motion to dismiss complaint).

**[9]** Reading the entirety of the bankruptcy court's order in context, and giving due weight to the court's subsequent interpretation of its own order, we must conclude that the court did not decide the question whether Magnacom was entitled to proceeds from the sale of the new licenses. *Id.* at 8. "A party invoking issue preclusion must show: (1) the issue at stake is identical to an issue raised in the prior litigation; (2) the issue was actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action." *Littlejohn v. United States*, 321 F.3d 915, 923 (9th Cir. 2003). Because the "issue at stake" in this case is not "identical to an issue raised in the prior litigation" and has not been adjudicated, issue preclusion does not bar the FCC from making its arguments here.[11]

The trustee also argues that the FCC's claim is barred by the doctrine of judicial estoppel. "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The trustee failed to raise this argument before either the bankruptcy court or the district court. We, therefore, deem it waived. *See El Paso v. Am. W. Airlines, Inc.* (*In re Am. W. Airlines, Inc.*), 217 F.3d 1161, 1165 (9th Cir. 2000).

---

[11]We also reject the trustee's argument that the bankruptcy court's October 5, 2004 ruling on this issue confused issue preclusion and claim preclusion. As our analysis indicates, the bankruptcy court did not reach the issue of the legal effect of the license cancellation.

## VI.

In sum, we uphold the bankruptcy court's dismissal of the trustee's claim. The FCC's license cancellation extinguished Magnacom's rights to the underlying spectrum. Magnacom has no claim to the proceeds of the subsequent auction of new licenses covering the same spectrum.

**Affirmed**.