# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 9, 2019          Decided July 16, 2019

No. 18-1176

GLH COMMUNICATIONS, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

---

On Appeal of Orders of the Federal Communications
Commission

---

*Donald J. Evans* argued the cause for appellant. With him on the briefs was *Keenan P. Adamchak*.

*David M. Gossett*, Deputy General Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Thomas M. Johnson Jr.*, General Counsel, *Jacob M. Lewis*, Associate General Counsel, and *Pamela L. Smith*, Counsel. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

Before: ROGERS, SRINIVASAN, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

2

SRINIVASAN, *Circuit Judge*: In 2001, GLH Communications, Inc., a cellular telephone company, acquired a number of radio spectrum licenses from Leap Wireless International, another cellular telephone company. Leap had originally purchased a handful of those licenses from the Federal Communications Commission under an installment payment program. When GLH acquired the licenses, it assumed the obligation to make the installment payments. GLH, though, failed to make the payments for some of the licenses, prompting the Commission to cancel those licenses and reauction the underlying spectrum to new providers.

In administrative proceedings before the Commission, GLH challenged both the Commission's decision to cancel the licenses and its refusal to give GLH a credit against its debt for the proceeds of the reauction. The Commission rejected GLH's arguments, and GLH now appeals. We conclude that the Commission acted appropriately in cancelling GLH's licenses for failure to make the installment payments and in refusing to apply the reauction proceeds against GLH's debt.

I.

The Federal Communications Commission has exclusive authority to grant licenses to use radio spectrum, and must, as a general matter, employ an auction system to assign licenses. *See* 47 U.S.C. §§ 307(a), 309(j). Congress identified various purposes that the Commission must seek to promote when designing an auction system. *See id.* § 309(j)(3). One of those purposes is ensuring that licenses are disseminated "among a wide variety of applicants, including small businesses." *Id.* § 309(j)(3)(B).

To that end, the Commission developed an installment plan program, under which qualifying small businesses can pay

winning auction bids in installment payments made over the term of the license. Such a program, the Commission reasoned, would enhance the ability of small businesses to participate in spectrum auctions by reducing the up-front costs of a license. The structure, however, comes with a condition: any licenses won with an installment bid "shall be conditioned upon the full and timely performance of the licensee's payment obligations under the installment plan." 47 C.F.R. § 1.2110(g)(4). If an installment-payment licensee misses a payment (and does not make up the payment within two quarter-long grace periods), the licensee "shall be in default, its license shall automatically cancel, and it will be subject to debt collection procedures." *Id.* § 1.2110(g)(4)(iv).

In 1996, the Commission auctioned off a number of licenses covering radio spectrum to be used for cellular telephone service. Two of the winning bidders in that auction were (i) NTCH, the parent company of GLH at the time, and (ii) a subsidiary of Leap Wireless International.

Three years later, NTCH and Leap agreed to trade some of the licenses each had won in the auction. Although the NTCH licenses included in the deal had been fully paid at the time of the auction, six of the Leap licenses had been purchased using the installment program. In order to secure Commission approval of the assignment of those licenses, GLH assumed both the security agreements executed by the Leap subsidiary when it won the licenses and also the obligation to make all remaining installment payments. At the same time, Leap agreed to pay GLH the funds necessary to make the installment payments each quarter.

The arrangement evidently worked without complication for a couple of years. But in January 2003, Leap failed to make its payment to GLH, and GLH then failed to make the next

installment payment to the Commission, due on January 31, 2003. Under the Commission's two-grace-period rule, GLH had until July 31, 2003 to cure the payment delinquency. But instead of curing the delinquency, GLH filed a waiver request, in which it explained the circumstances of the missed payment and asked the Commission for a two-year waiver of its debt collection rules and payment deadlines to "allow GLH additional time to try to satisfy its obligations." Request of GLH Communications, Inc. for Temporary Waivers of Installment Payment Deadlines (47 C.F.R. § 1.2110(g)(4)) and Debt Collection Rules (47 C.F.R. § 1.1901 et seq.), at 6 (Apr. 16, 2003), J.A. 42.

On July 18—approximately two weeks before the end of GLH's grace period—the Commission's Auctions and Industry Analysis Division released an order denying GLH's request for a waiver of the payment deadlines. *See In re Request of GLH Commc'ns, Inc. for Temporary Waivers of Installment Payment Deadlines*, 18 FCC Rcd. 14,695 (2003), J.A. 76. The Division explained that "strict enforcement of the installment payment rules enhances the integrity of the auction and licensing process," and determined that GLH had not shown any unique circumstances rendering enforcement of the deadline inequitable. *Id.* ¶ 11; *see id.* ¶¶ 7–18.

When the deadline arrived, GLH had paid its outstanding obligations on only two of the six licenses. The remaining four licenses automatically cancelled under the governing regulation. 47 C.F.R. § 1.2110(g)(4). After the cancellation, GLH filed a petition for reconsideration of the Division's Order denying a waiver. In addition to the arguments made in its waiver request, GLH contended that the Commission had been required by a statute, 47 U.S.C. § 312(c), to provide a hearing before cancelling the licenses, and further argued that, if the

Commission decided to proceed with cancellation, it should return the payments GLH had previously made.

While GLH's rehearing petition was pending, the Commission reauctioned the spectrum covered by GLH's cancelled licenses to new buyers. The Commission's Wireless Telecommunications Bureau then released an order denying the petition for rehearing. *See In re GLH Commc'ns, Inc.*, 22 FCC Rcd. 2411 (2007), J.A. 104. With respect to GLH's waiver request, the Bureau's Order largely repeated the reasoning of the Division. *See id.* ¶¶ 12–22. With respect to GLH's new arguments, the Bureau determined that § 312(c)'s hearing requirement does not apply to automatic cancellations for defaults under 47 C.F.R. § 1.2110(g)(4)(iv) and that GLH was not entitled to any refund of its previous payments. *Id.* ¶¶ 23–25.

GLH then filed an application for review with the full Commission, in which it repeated the arguments it had previously made before the Division and the Bureau. Because the spectrum had since been reauctioned, GLH also argued that it was entitled to remission of any reauction proceeds exceeding GLH's debt.

The Commission denied GLH's application for review. *In re Alpine PCS, Inc.*, 255 FCC Rcd. 469 (2010), J.A. 163. It largely repeated the reasoning contained in the previous orders and additionally concluded that GLH was not entitled to have the reauction proceeds set off against its debt. *Id.* ¶¶ 18–38, 47–50, 58–66, 83–85. GLH unsuccessfully sought rehearing before the Commission, *see In re GLH Commc'ns, Inc.*, 33 FCC Rcd. 5926 (2018), J.A. 220, and then brought this appeal.

6

II.

GLH raises two groups of challenges to the Commission's decision. It initially argues that the Commission erred in cancelling its licenses, both because the decision to reject its waiver request was arbitrary and capricious and because it was entitled to a pre-cancellation hearing. Then, GLH argues that even if the Commission validly cancelled its licenses, the Commission should have granted it a credit for the reauction proceeds or forgiven its debt.

"We review the FCC's decision only to determine whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' Our review is 'very deferential.'" *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1121 (D.C. Cir. 2017) (first quoting 5 U.S.C. § 706(2)(A); then quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)) (citation omitted). A Commission decision is arbitrary and capricious if the Commission "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

A.

We first address GLH's arguments that the Commission erred in denying GLH's waiver request and failing to provide it a hearing before cancelling its licenses.

1.

GLH contends that the Commission's denial of its request for a waiver of the installment-payment deadline was arbitrary and capricious. The Commission's regulations allow it to grant a request to waive the installment payment rules if a licensee shows either (i) that "[t]he underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest," or (ii) that "[i]n view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative." 47 C.F.R. § 1.925(b)(3).

In rejecting GLH's waiver request, the Commission explained that the auction system is designed to award each license "to the party that placed the highest value on the spectrum." *In re Alpine PCS, Inc.*, 255 FCC Rcd. 469, at ¶¶ 20–21. But "allow[ing] licensees to keep their licenses after they had failed to comply with the Commission's payment rules" would interfere with that goal by "increas[ing] the incentive for bidders to make bids they could not pay and reduc[ing] opportunities for other bidders to win licenses." *Id.* ¶ 21. As a result, the Commission explained, "strict enforcement of the installment payment rules preserves a fair and efficient licensing process and promotes the rapid deployment of services for the benefit of the public," and the rationale for strict enforcement applies "whether the licensee acquired the license directly through competitive bidding or through assignment in the secondary market." *Id.* The Commission thus had previously granted a waiver request "only after finding that there was no serious question regarding the defaulting licensee's ongoing ability and willingness to fulfill its payment obligations despite the default and, therefore,

no question regarding the presumption that it remained best suited to utilize the spectrum." *Id.* ¶ 22.

Applying that approach to GLH's waiver request, the Commission determined that GLH had not demonstrated an "ongoing financial ability and willingness to fulfill [its] payment obligations post-default." *Id.* ¶ 29. The Commission concluded that granting GLH's request therefore would serve neither the purposes of the automatic-cancellation rule nor the public interest. *See id.* ¶ 31. Additionally, the Commission found that GLH had not demonstrated any "unique factual circumstances" entitling it to a waiver. *Id.* ¶ 32. The Commission explained that "claims regarding financial difficulties resulting from a licensee's business decisions and commercial dealings, including those in which a third party has withdrawn its financial support, do not amount to unique facts or circumstances that make application of the automatic cancellation rule inequitable, burdensome, or contrary to the public interest," because the Commission "cannot take into account the private business arrangements that an applicant has made to finance its successful auction bid." *Id.* (citation and alteration omitted).

The Commission's explanation of its decision, at least on its face, is more than adequate to survive arbitrary-and-capricious review. The Commission appropriately explained the legal standard, examined the particular facts of GLH's case, and reasonably applied that standard to those facts. GLH advances three arguments as to why the Commission's decision nonetheless is arbitrary and capricious, none of which we find persuasive.

First, GLH contends that the public interest favored granting its waiver request because it had already built the necessary infrastructure and begun providing cellular service

before its default. Although avoiding a discontinuation of ongoing service weighed in GLH's favor, the Commission considered that factor and determined that the "broader public interest in preserving the integrity and efficiency of the Commission's auction process, as well as the Commission's obligation to fairly and consistently enforce its installment payment rules," outweighed the public "interest in a particular licensee's provision of service." *Id.* ¶ 37. That determination was reasonable and fell squarely within the Commission's technical competence.

Second, GLH asserts that the Commission's desire to preserve the integrity of the auction process should not have carried the day because GLH acquired its licenses by assignment rather than in an auction. That argument, too, was considered and rejected by the Commission. *See id.* ¶ 21 & n.111 (citing *In re GLH Commc'ns, Inc.*, 22 FCC Rcd. 2411, at ¶ 15). As the underlying Bureau Order explained, a winning bidder "demonstrat[es] the integrity of its valuation by paying the amount of the winning bids," and that demonstration continues past assignment when an assignee "assume[s] the winning bidder's obligation to fully and timely pay the amount of the winning bids." *In re GLH Commc'ns, Inc.*, 22 FCC Rcd. 2411, at ¶ 15. Allowing an original purchaser who is unable to meet its obligations simply to assign the license with the understanding that the Commission will treat the assignee more leniently could compromise the Commission's ability to ensure the integrity of the underlying valuation. The Commission thus reasonably concluded that an assignee's timely payment "is important to the integrity of the auctions program." *In re Alpine PCS, Inc.*, 255 FCC Rcd. 469, at ¶ 21 n.111.

Third, GLH argues that the Commission's rejection of its waiver request was inconsistent with the Commission's 1997 decision to provide a suite of debt-relief options to distressed

installment payers. *See In re Amendment of the Comm'n's Rules Regarding Installment Payment Fin. for Personal Commc'ns Servs. (PCS) Licenses*, Second Report and Order and Further Notice of Proposed Rulemaking, 12 FCC Rcd. 16,436 (1997). We are unable to consider that argument because GLH did not appropriately raise it before the Commission. *See* 47 U.S.C. § 405(a). GLH advanced the argument only in a single oblique reference in its petition for reconsideration before the Bureau. *See* GLH Pet. for Recons. 2 & n.3, J.A. 90. That single reference, however, was insufficient to provide the Commission "a *fair* opportunity to pass on" GLH's argument, *Time Warner Ent'mt Co. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998), both because it was only a passing reference and also because GLH failed to renew the argument in its application for review before the Commission itself, *see Coal. for Noncommercial Media v. FCC*, 249 F.3d 1005, 1009 (D.C. Cir. 2001).

For those reasons, we conclude that the Commission's denial of GLH's waiver request was not arbitrary or capricious.

2.

GLH also contends that 47 U.S.C. § 312(c) required the Commission to hold a hearing before cancelling GLH's licenses. That provision requires the Commission to hold a hearing "[b]efore revoking a license . . . pursuant to subsection (a)." 47 U.S.C. § 312(c). Subsection (a), in turn, grants the Commission authority to revoke a station license for seven specific reasons, such as "false statements knowingly made . . . in the application," "willful or repeated failure to operate substantially as set forth in the license," and "willful or repeated violation of, or willful or repeated failure to observe[,] any provision of this chapter or any rule or regulation of the" Commission. *Id.* § 312(a).

As the Commission concluded in its Order, *see In re Alpine PCS, Inc.*, 255 FCC Rcd. 469, at ¶¶ 84–85, GLH's licenses were not revoked for any of the reasons enumerated in § 312(a). Instead, they were automatically cancelled under the applicable regulation, 47 C.F.R. § 1.2110(g)(4)(iv), when GLH defaulted on its installment payments. *See* 47 C.F.R. § 1.2110(g)(4)(iv) ("If an eligible entity obligated to make installment payments fails to pay the total Required Installment Payment, interest and any late payment fees associated with the Required Installment Payment within two quarters (6 months) of the Required Installment Payment due date, it shall be in default, its license shall automatically cancel, and it will be subject to debt collection procedures."). The terms of § 312(c) thus do not afford GLH a right to a pre-cancellation hearing: § 312(c) provides a hearing right for revocations "pursuant to" § 312(a), and GLH's licenses were not cancelled pursuant to § 312(a).

GLH argues that, under that reading, the Commission could regulate its way around § 312(c) by simply repeating § 312(a)'s statutory grounds for revocation in a regulation, conditioning licenses on compliance with the regulation, and then cancelling licenses upon a failure to comply without affording any hearing. GLH's argument might have some force if the Commission had in fact parroted § 312(a) in regulations and then relied on those regulations to cancel GLH's licenses. In such a situation, it might fairly be said that the licenses were cancelled "pursuant to" both § 312(a) and the regulations. But that is not what happened here. Rather, the underlying reason for cancellation—that GLH defaulted on its installment payments—does not appear in § 312(a) at all. The cancellation of GLH's licenses then cannot have taken place under § 312(a), and § 312(c) did not afford GLH a right to a pre-cancellation hearing.

12

B.

In addition to arguing that the Commission erred in cancelling GLH's licenses, GLH also argues that, now that the underlying auction spectrum has been resold, it is entitled to compensation from the reauction or a forgiveness of its debt.

1.

GLH first contends that the Uniform Commercial Code governs its relationship with the Commission and that the UCC entitles GLH to receive any reauction proceeds exceeding the amount of its debt to the Commission. With respect to that argument, GLH and the Commission initially agree that, in the absence of any on-point statute, a commercial transaction between the United States and a private party is governed by federal common law. *See* GLH Br. 39–40; FCC Br. 29 (citing *Leonard J. Kennedy, Esq., & Richard S. Denning, Esq.*, 11 FCC Rcd. 21,572, 21,577 (1996)); *cf. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29 (1979); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67 (1943). The content of that common law turns on a variety of factors, such as whether there is a need for a uniform federal standard or whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods*, 440 U.S. at 728–29. GLH argues, and the Commission has previously stated, that consideration of those factors should lead a federal court to "apply the basic principles of Article 9 of the UCC" to secured transactions between the Commission and licensees, modifying them "as necessary to produce a uniform national result consistent with Congressional intent and FCC policies set forth in the Communications Act and applicable FCC rules and orders." *Leonard J. Kennedy, Esq., & Richard S. Denning, Esq.*, 11 FCC Rcd. at 21,578; *see also* GLH Br. 39–40.

Assuming for the sake of argument that consideration of the appropriate factors would lead us to adopt the principles of the UCC to the extent they do not conflict with federal interests or policies, we cannot accept GLH's argument that the UCC governs the Commission's actions in this case. "Article 9 of the UCC sets forth a secured creditor's lien-enforcement remedies," which means it would support GLH's "claim of entitlement to proceeds from the FCC's sale of new licenses only if the FCC's cancellation of the licenses was a lien-enforcement remedy under the UCC." *In re Magnacom Wireless, LLC*, 503 F.3d 984, 993 (9th Cir. 2007). But unlike a private party, the Commission does not act only as a creditor, even when dealing with installment payers owing it a debt. Instead, the Commission also acts as a regulator. And while the Security Agreement assumed by GLH acknowledges that a default will trigger automatic cancellation pursuant to 47 C.F.R. § 1.2110, *see* Security Agreement ¶ 8(a), J.A. 11, the authority to cancel the licenses comes not from the Security Agreement but from the referenced regulation.

Consequently, the Commission "had a regulatory . . . right to cancel [GLH's] licenses" when GLH defaulted, and that "right was separate and independent from the FCC's rights as a secured creditor." *Magnacom*, 503 F.3d at 994; *cf.* Security Agreement ¶ 2, J.A. 8 (acknowledging that the FCC's security interest in the licenses is "not in derogation of any of the Commission's regulatory authority over the License[s]"). "Because the FCC's license cancellation is not a UCC lien-enforcement remedy, the UCC's requirements are simply inapplicable" to the cancellation. *Magnacom*, 503 F.3d at 994. And because GLH held an interest only in the licenses and not in the underlying spectrum, *see* Security Agreement ¶ 2, J.A. 8; 47 U.S.C. § 301, once the licenses were cancelled pursuant to the Commission's regulatory authority, GLH had no claim

under the UCC to the proceeds of the reauction of the underlying spectrum.

2.

Next, GLH argues that the Commission's refusal to offset its debt with the proceeds of the auction constituted an impermissible retroactive reinterpretation of 47 C.F.R. § 1.2104(g)(2). That regulation establishes a specified penalty for high bidders who default or are disqualified "after the close" of a license auction. In GLH's view, the penalty set forth in that regulation should cap its exposure, such that it should effectively be entitled to a set-off (from the reauction proceeds) of any additional exposure.

GLH's argument derives from the history of the Commission's interpretation of the regulation—concerning, in particular, the applicability of the regulation to installment payers. Under the version of the regulation in effect in 1996, a bidder who defaulted "after the close" of an auction was "subject to a penalty equal to the difference between the amount bid and the amount of the winning bid the next time the license is offered by the" Commission "plus an additional penalty equal to 3 percent of the subsequent winning bid" or the defaulter's bid (whichever was lower). GLH Br. SA-7 (quoting 47 C.F.R. § 1.2104(g) (1996)).

In 1997, the Commission released an order explaining that, when an installment payer defaults, its license "will be cancelled automatically and the Commission will initiate debt collection procedures" pursuant to 47 C.F.R. § 1.2110, but that § 1.2110 did "not clearly indicate . . . whether under these circumstances the licensee will be liable for the default payment set forth in Section 1.2104(g)." *In re Amendment of Part I of the Comm'n's Rules – Competitive Bidding*

*Procedures*, 13 FCC Rcd. 374, 442 (1997) (1997 Order). In determining that such defaulters should not be liable for the payment described in § 1.2104(g), the Commission concluded that "an additional payment requirement for licensees defaulting on installments is not necessary" because the Commission's "current rules and installment payment terms are adequate to discourage defaults," and "the conditions on the face of each license and the terms of the notes and security agreements executed by licensees provide the Commission appropriate remedies that will ensure that defaulted licenses are returned to the Commission for reauction and that all outstanding debts, as well as the Commission's costs, are recoverable." *Id.* at 443.

The Commission thereby explained in the 1997 Order that installment payment defaulters would not be liable for the § 1.2104(g) penalty payment (and explained why the Commission adopted that interpretation of § 1.2104(g)). But two later statements in the Order appeared to suggest that defaulters in fact would be liable for the payments. First, the Order stated that, "by making licensees who default on an installment payment subject to the default payment set forth in Section 1.2104(g)(2), we create an additional deterrent to licensees considering default as a solution to financing shortfalls." *Id.* at 446. Second, the Order stated that, "upon default on an installment payment, a license will automatically cancel without further action by the Commission, the licensee will become subject to the default payment set forth in Section 1.2104(g) of our rules . . . , and the Commission will initiate debt collection procedures against the licensee." *Id.* at 446–47.

In an attempt to rectify any confusion created by the apparent contradictions in the Order, the Commission amended the Order the following year to remove the language in the second sentence quoted above saying that "the licensee will

become subject to the default payment set forth in Section 1.2104(g) of our rules"; but the amendment erroneously failed to remove the first sentence. *See id.* at Erratum ¶ 8. In two subsequent orders in 2000 and 2004, the Commission eliminated any remaining confusion about the applicability of the § 1.2014(g) penalty provision to installment-payment defaulters by reaffirming that the penalty provision does not in fact apply to such defaulters. *See In re Amendment of Part I of the Comm'n's Rules – Competitive Bidding Procedures*, 15 FCC Rcd. 15,293 (2000) (2000 Order); *In re Amendment of Part I of the Comm'n's Rules – Competitive Bidding Procedures*, 19 FCC Rcd. 2551 (2004) (2004 Order).

Under GLH's view of that history, it did not become clear until the 2004 Order (after GLH had defaulted) that § 1.2104(g)(2) does not apply to installment-payment debtors. And under GLH's reading, applying § 1.2104(g)(2) to GLH's default would effectively entitle it to a set-off of the reauction proceeds against its debt. Refusing to grant it a set-off, GLH argues, violates the principle against retroactivity embedded in the Administrative Procedure Act, *see* 5 U.S.C. § 551(4), by imposing the higher penalties mandated by the 2004 Order (rather than the lower penalties mandated by the 1997 Order) on its default.

We are unpersuaded by GLH's argument. First, GLH misunderstands the question considered by the Commission in the 1997 Order. GLH appears to believe that, if the Commission had concluded that § 1.2104(g) applies to installment payers, GLH then would have been entitled to the effective set-off it reads into that provision. But in actuality, the Commission indicated at every step of the way that installment payers were always subject to the cancellation and debt-collection penalties described in the separate regulation specifically addressing installment-payment defaults, 47

C.F.R. § 1.2110, including full liability for the purchase price of the licenses. The only question the Commission considered with respect to installment payers and § 1.2104(g)(2) was whether defaulting payers would *also* be subject to the 3% penalty and deficiency payment described in § 1.2104(g). *E.g.*, 1997 Order, 13 FCC Rcd. at 446 ("[B]y making licensees who default on an installment payment subject to the default payment set forth in Section 1.2104(g)(2), we create an *additional* deterrent to licensees considering default as a solution to financing shortfalls." (emphasis added)). In short, even if GLH were correct that it did not become clear until 2004 that § 1.2104(g) does not apply to its default, it was helped—not hurt—by that clarification.

Second, even assuming GLH were correct about the question under consideration in the 1997 Order, the Commission had made sufficiently clear, at least by the time of GLH's assumption of the installment-payment obligations, that § 1.2104(g) did not apply to installment payers who defaulted after the award of a license. The 1997 Order engaged in a detailed discussion of the Commission's rationale for finding that § 1.2104(g) does not apply to installment payers. Although GLH identifies some seemingly contradictory language in a later portion of the Order, no reasonable licensee reading the Order as a whole would have concluded that § 1.2104(g) applies to installment payers. And one of the contradictory statements was removed in an erratum issued the following year, which would have reinforced the recognition that the Commission believed § 1.2104(g) does not apply to installment payers and that those contradictory statements were simply an error. The 2000 and 2004 Orders merely clarified, rather than changed, the Commission's position. As a result, the Commission's refusal to grant GLH a set-off of its debt with the reauction proceeds did not involve any impermissible

retroactive change in the Commission's interpretation of § 1.2104(g).

3.

Finally, GLH argues that because the proceeds of the spectrum reauction exceeded the amount of GLH's outstanding debt, the Commission has been made whole and GLH is entitled to a forgiveness of its debt. GLH's argument stems from an opinion letter released by the Commission responding to concerns about the note and security agreement that the Commission required installment payers to execute. *See Leonard J. Kennedy, Esq., & Richard S. Denning, Esq.*, 11 FCC Rcd. 21,572. One of those concerns was that, in the event of a default, the Commission could both reauction the spectrum and collect on the note, resulting in a double recovery. *Id.* at 21,576. According to the Commission, that concern was misplaced because "the equity principles established" in the Debt Collection Act, 31 U.S.C. ch. 37, and Federal Claims Collection Standards, 31 C.F.R. ch. IX, "should allow the federal government to forgive any outstanding debt so long as it has been made whole (penalties and costs included) in a subsequent auction." *Leonard J. Kennedy, Esq., & Richard S. Denning, Esq.*, 11 FCC Rcd. at 21,576. Therefore, GLH argues, because the Commission has been made whole through the reauctions in this case, it must forgive GLH's outstanding debt.

Although GLH is correct that, based on the opinion letter, the Commission may agree that GLH's debt should be forgiven if the Commission has been made whole, GLH has raised its argument in the wrong proceeding. The Debt Collection Act and Federal Claims Collection Standards provide a mechanism for (and a set of standards governing) debt compromise requests, and place the ultimate authority to compromise debts

as large as GLH's in the Department of Justice rather than in the Commission. *See* 31 C.F.R. § 902.1(b). GLH thus can raise its debt-forgiveness argument in a petition for debt compromise that it can submit to the Commission, *see* 47 C.F.R. § 1.1915, or as a defense in any future debt-collection action (the Commission has not initiated any collection action), rather than as a subsidiary argument in this license-cancellation proceeding. (And, if GLH's argument persuades the Commission that a compromise is appropriate, the Commission can seek compromise approval from the Department of Justice.)

That understanding is confirmed both by the 2004 Order, *see* 2004 Order, 19 FCC Rcd. at 2558 (explaining that the opinion letter "makes clear that any forgiveness of a debt arising from an installment payment default would occur only in the course of federal debt collection proceedings"), and also by Commission counsel in oral argument, *see* Oral Argument 23:16–27:43. We thus affirm the Commission's decision not to consider the argument or forgive GLH's debt in this proceeding, understanding that GLH may initiate consideration of its equitable argument for debt forgiveness by filing a petition for debt compromise.

\* \* \* \* \*

For the foregoing reasons, we affirm the decision of the Federal Communications Commission.

*So ordered.*